**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

STUDENT DOE 1, et al.,         :      CIVIL ACTION
                            :
         v.                :
                            :
LOWER MERION SCHOOL DISTRICT  :     NO. 09-2095

## <u>MEMORANDUM ON SUMMARY JUDGMENT</u>

**Baylson, J.**                                          **February 24, 2010**

Pending before this Court is Defendant Lower Merion School District's ("Defendant")
Motion for Summary Judgment (Docket No. 32). Plaintiffs Student Does 1 through 9, by and
through their Parents/Guardians 1 through 10 ("Plaintiffs"), allege, <u>inter alia</u>, that they were
discriminated against based on their race when Defendant adopted a redistricting plan in January
2009 that took away their ability to choose what high school to attend, and required them to
attend a particular high school. For the reasons that follow, the Court will not award summary
judgment in favor of Defendant.

## I.    <u>Factual and Procedural Background</u>

Construing all facts in favor of the non-movants, Plaintiffs, a concise summary of the
facts and procedural history relevant to the pending Motion is set forth below. Note that the
Court will describe various contested facts <u>infra</u> in its Discussion Section.

### A.    **The Parties**

Lower Merion Township, which is located in Montgomery County, Pennsylvania,
through its School District, operates six elementary schools including Penn Valley Elementary
School, two middle schools, including Welsh Valley Middle School, and two high schools,

Harriton High School and Lower Merion High School. (Defs.' Statement of Undisputed Material Facts ¶ 1("Undisputed Facts"); Compl. ¶ 17.) Defendant receives federal funding and has never been subject to a court-ordered busing decree. (Compl. ¶¶ 19-20.) Nine elected School Directors ("Board Members") make up the Lower Merion Board of School Directors ("Board"), which has been vested with the authority to assign students to schools within Lower Merion. (Undisputed Facts ¶ 3.)

Plaintiffs are African-American students who reside in Lower Merion. (Undisputed Facts ¶¶ 5-6.) With the exception of Student Doe 4, who elected to attend Harriton High for the 2009-2010 academic year, Plaintiffs attend Penn Valley Elementary School or Welsh Valley Middle School. (Undisputed Facts ¶¶ 9-17, 20.) Plaintiffs' neighborhood ("Affected Area") is bounded by Athens Avenue, Wynnewood Road, County Line Road, and Cricket Avenue in South Ardmore, Pennsylvania, an area that has a more significant African-American population than other parts of Lower Merion. (Undisputed Facts ¶ 7, Oral Arg. Tr. 19:18-25, Feb. 4, 2010, Docket No. 43.) As of September 1008, the Affected Area had 308 students in grades K through 12, of which 140 are White, 140 are African American, 9 are Asian American, and 18 are Hispanic American. (Undisputed Facts ¶ 8.) Prior to redistricting, students in the Affected Area had the choice of attending Lower Merion High School or Harriton High School; now, the students must attend the latter. (Undisputed Facts ¶ 18.)

B.     The Redistricting Process

In 1997, the District began a capital improvement program to modernize its schools, including Lower Merion High School and Harriton High School, both of which needed significant physical plant investments. (Undisputed Facts ¶¶ 22-23.) The Board established a

forty-five member Community Advisory Committee ("CAC") made up of school, community, and other interested individuals, that examined how to modernize the two high schools. (Undisputed Facts ¶¶ 24-25.) The CAC voted in favor of a plan to build two high schools of equal enrollment capacity, and the Board accepted this recommendation. (Undisputed Facts ¶ 29.) Because Harriton High School had seven hundred more students than Lower Merion High School, Defendant decided to redraw the attendance zones or "redistrict." (Undisputed Facts ¶¶ 31-32.) The redistricting process occurred in three phases. (Undisputed Facts ¶ 37.)

Plaintiffs contend that "discriminatory purpose existed throughout the redistricting process," beginning prior to Phase I, when Defendant's former Superintendent publicly remarked, and he and other "top level Administrators" stated to the Board, that redistricting should address minority student assignments and consider racial balance during redistricting. (Summ. J. Resp. to Summ J. Mot. 8-10, Exs. 1, 6 ("Summ. J. Resp.").)

### 1. Phase I

At an April 21, 2008 Board meeting, the issue of redistricting based on race surfaced after a community member expressed concern that having "less than 15 percent of a minority in a school" makes members of the minority group "token icons of their race." (Summ. J. Resp., Ex. 7, at 2:13-16.) The same day, the Board adopted a set of guiding principles called "Non-Negotiables"[1] that must guide the redistricting process. (Undisputed Facts ¶¶ 44, 46.)

---

[1]The five "Non-Negotiables" are as follows:

(1) the enrollment of the two high schools and two middle schools would be equalized; (2) elementary students would be assigned so that the schools were at or under the school capacity; (3) the plan should not increase the number of buses required; (4) at a minimum, the class of 2010 would have the choice to either follow the redistricting plan or stay at the high school of their previous year (i.e., implement the principle of "grandfathering"); and

Beginning in May 2008, in order to "develop citizen-driven values to guide the development of the redistricting proposal," Defendant hired outside consultants who facilitated public forums and collected on-line surveys in order to compile a list of "Community Values" identified by Lower Merion residents. (Undisputed Facts ¶¶ 39-42.) One of the "Community Values" was to "Explore and cultivate whatever diversity–ethnic, social, economic, religious, and racial–there is in Lower Merion." (Summ. J. Resp. 11, Ex. 2; see also Undisputed Facts ¶ 42.)

### 2. Phase II

The District then hired Dr. Ross Haber to review and analyze demographic enrollment data, including race, and to propose alternative redistricting plans in light of the Non-Negotiables and Community Values. (Undisputed Facts ¶¶ 48-49, 51.) Dr. Haber created several documents listing the diversity outcomes for potential redistricting scenarios, and referenced the terms "racial balance" or "racial imbalance." (Undisputed Facts ¶ 57.) The redistricting scenarios Dr. Haber prepared were not fully adopted by the Board. (See Undisputed Facts ¶ 58; Pls.' Resp. to Undisputed Facts ¶ 58 ("Undisputed Facts Resp.").)

### 3. Phase III

Beginning in September 2008, Defendant presented various proposed redistricting plans to the public and invited public comment. (Undisputed Facts ¶¶ 59-62.) Proposed Redistricting Plan 1 altered "feeder patterns" for Penn Wayne Elementary School students, requiring them to "feed" into Welsh Valley Middle School and then Harriton High School. (Undisputed Facts ¶

---

(5) redistricting decisions would be based upon current and expected future needs and not based upon past redistricting outcomes or perceived past promises or agreements.

(Undisputed Facts ¶ 45.)

66.)  Proposed Redistricting Plan 2 then incorporated goals of reducing students' travel times, disruption, and separation from classmates, and maintaining existing boundary and walking zones.  (Undisputed Facts ¶¶ 73, 77).  The next plan, Proposed Redistricting Plan 3, aimed to maintain established middle school feeder patterns, to permit students within a small walk zone of Lower Merion High School to choose what high school to attend, but to assign students outside of that small walk zone but inside of the historical Lower Merion High School walk zone to Harriton High.  (Undisputed Facts ¶¶ 85-87.)  Accompanying the presentation of Proposed Redistricting Plans 1, 2, and 3 were slide shows that showed a "dramatic shift in diversity at Harriton High School."  (Summ. J. Resp. ¶¶ 69, 79, & 89, Exs. 34, 36, & 38.)[2]

---

[2]In particular, Proposed Redistricting Plan 1 was accompanied by a slide with the following "Statistics for New High School Attendance Zones":

| Total Enrollment | Lower Merion High School | Harriton High School |
|---|---|---|
|  | 1, 137 | 1, 108 |
| Diversity |  |  |
| Socio-Economic | 207 | 206 |
| Children with Disabilities | 203 | 187 |
| Asian | 78 | 67 |
| African American | 103 | 110 |
| Hispanic | 28 | 20 |
| Am Ind/Pac Isl | 4 | 8 |
| White | 924 | 901 |

(Summ. J. Resp., Ex. 34, at Students Doe 00047.)
    Then, Proposed Redistricting Plan 2 had the following information on its "High School Student Populations" slide:

|  | Harriton High School | Lower Merion High School |
|---|---|---|
| Asian | 77 | 73 |
| African American | 88 | 140 |
| Hispanic | 27 | 29 |
| Am Ind/Pac Isl | 7 | 2 |
| White | 936 | 897 |
| Socio-Economic | 72 | 83 |
| Special needs | 246 | 218 |

(Summ. J. Resp., Ex. 36, at Students Doe 00294.)
    The slideshow for Proposed Redistricting Plan 3 included the following "Enrollment

On December 15, 2008, a modified version of Plan 3 ("Plan 3R) was presented to the

Board. (Undisputed Facts ¶ 90.) Plan 3R extended high school choice to students within the

historical Lower Merion High School walk zone, but required students attending Penn Valley

Elementary School living outside of the walk zone to attend Welsh Valley Middle School and

then Harriton High School. (Undisputed Facts ¶ 95.) Plan 3R's presentation was not

accompanied by slides regarding diversity. (Undisputed Facts ¶ 99.) On January 12, 2009,

Board adopted Plan 3R, and immediately began implementing the plan in time for the 2009-2010

school year and the opening of the new Harriton High School. (Undisputed Facts ¶¶ 103, 105.)

As of December 2009, 897 students are enrolled at Harriton High School, of which 740

are White, 74 are African American, 55 are Asian American, 23 are Hispanic American, and 5

are American Indian. As for Lower Merion High School, also as of December 2009, a total of

1401 students are enrolled, of which 1,098 are White, 176 are African American, 90 are Asian

American, 29 are Hispanic American, 4 are American Indian, and 5 identify as being of more

than one race. (Undisputed Facts ¶¶ 106-109.)

## C. District Court Proceedings

Data":

| Lower Merion | | Harriton | |
|---|---|---|---|
| 1185 | | 1089 (includes IB students) | |
| | | | |
| Asian | 91 | Asian | 59 |
| Black | 123 | Black | 105 |
| Hispanic | 28 | Hispanic | 31 |
| Am Ind | 3 | Am Ind | 6 |
| White | 982 | White | 848 |
| | | | |
| Socio Economic 66 | | Socio Economic 103 | |
| IEP | 261 | IEP | 261 |

(Summ. J. Resp., Ex. 38, at Students Doe 00220.)

On May 14, 2009, Plaintiffs commenced this action, alleging that Defendant violated the Equal Protection Clause of the Fourteenth Amendment (Count I), 42 U.S.C. § 1981 (Count II), and Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et. seq. (Count III), all pursuant to 42 U.S.C. § 1983.  (Docket No. 1.)  The Court denied Defendant's Motion to Dismiss, or in the Alternative, for a More Definite Statement.  (Docket No. 7.)  Plaintiffs then moved for preliminary injunctive relief restoring their choice to attend either high school (Docket No. 5), but subsequently agreed to withdraw this request (Docket No. 26), because the only Plaintiff who was old enough to attend high school voluntarily agreed to attend Harriton High School (Undisputed Facts ¶ 112).

On December 31, 2009, after the parties completed discovery, Defendant filed the pending Motion for Summary Judgment.  On February 4, 2010, the Court heard oral argument on the Motion.

## II.    The Parties' Contentions

### A.    Defendant's Arguments

In moving for summary judgment, Defendant avers that Plaintiffs have failed to show purposeful discrimination.  According to Defendant, redistricting Plan 3R's race neutrality is demonstrated by the absence of any racial classification in the plan and guiding Non-Negotiables, and the fact that Board Members neither considered nor discussed race, nor were provided with data on race, and thus, were unaware as to the impact the plan would have on racial diversity. (Summ. J. Mot. 11-15.)  Defendant continues that Plaintiffs were treated the same as all other similarly situated students, that being school-age children registered to attend public school and residing within the Affected Area, who were also zoned for Harriton High School.  (Summ. J.

Mot. 13-14.)

Defendant then contends that the mere inclusion of racial diversity data in Dr. Haber's reports does not evince purposeful discrimination, because the district is required by law to maintain and review such data, and such data only reports after-the-fact race outcomes to respond to the community's expressed interest in preserving many types of diversity, including that of race. (Summ. J. Mot. 17-19.) Defendant avers that Plaintiffs have provided no valid statistical data showing that race was a factor in redistricting, as is evidenced by the fact that Plaintiffs' expert's report is contradictory, and rebutted by Defendants' expert. (Summ. J. Mot. 22-24.) In addition, Defendant argues that the fact that several more racially balanced and diverse plans were rejected by the Board shows that the Board did not purposefully discriminate on the basis of race. (Summ. J. Mot. 24-25.)

Defendant also seeks to distinguish this case from Parents Involved in Community Schools v. Seattle School District No. 1, 551 U.S. 701 (2007), in which the Supreme Court struck down as unconstitutional student reassignment plans, because such plans expressly included racial classifications, employed "crude" racial categories, and selected individual students based on their race; in contrast, Plan 3R supposedly assigns students based on feeder patterns regardless of race and only remained cognizant of the schools' racial makeup in order to encourage diversity, which Justice Kennedy's concurring opinion in Seattle deemed to be constitutionally permissible. (Summ. J. Mot. 1-2, 26-27.) Defendant thereby concludes that rational basis scrutiny applies in this case, that no issue of genuine material fact remains, and that summary judgment relief is appropriate.

B.      Plaintiffs' Arguments

In response, Plaintiffs contend that Defendant employed a racially-based redistricting policy by listing racial diversity as a relevant criterion in the Community Values, and repeatedly confirming that racial diversity guided the creation of redistricting plans and consideration of these. (Summ. J. Resp. 4-7.) Plaintiffs aver that even if the plan is facially neutral, before and throughout the redistricting process, Defendant, through its Board Members, district officials, and outside consultants, indicated that they purposefully discriminated on the basis of race. (Summ. J. Resp. 7-31.) In particular, Plaintiffs point to several remarks these individuals made purportedly referencing race, the need to correct for racial imbalance during the redistricting process, and efforts to purge official communications of references to race. (Summ. J. Resp. 7-31.) Plaintiffs add that statistical evidence suggests that Plaintiffs were not racially isolated based on chance alone. (Summ. J. Resp. 19-20.)

Regarding similarly-situated individuals, Plaintiffs argue that Defendant cannot deflect an Equal Protection challenge by observing that those in a similar statutory classification are similarly situated, because the classification must reflect pre-existing differences, and the Equal Protection Clause requires more than nondiscriminatory application. (Summ. J. Resp. 23.) Plaintiffs also contend that this case is governed by Seattle, because both cases involve school policies that assign students in part based on race, and that Defendant's plan is in fact more "pernicious" because the racial preference plan comes into play each year, as opposed to the plan in Seattle that may not be triggered in a given year. (Summ. J. Resp. 23.) According to Plaintiffs, Justice Kennedy's concurring opinion in Seattle is binding insofar as it consistently reiterates that it is unconstitutional to classify students based on race, and that a plan such as Defendant's should be subjected to strict scrutiny. (Summ. J. Resp. 29-30.) Plaintiffs, therefore,

conclude that the Motion should be denied.

**III.    Discussion**

Because Plaintiffs contend that under the Supreme Court's recent decision in Seattle, strict scrutiny applies, the first question the Court must address is whether Plaintiffs are correct, or whether the Motion should be analyzed under the summary judgment framework articulated in Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

**A.    Levels of Scrutiny**

In evaluating challenges under the Equal Protection Clause, the Supreme Court has articulated various standards, called levels of scrutiny, which courts use to determine whether a challenged law or policy is constitutional.  The Supreme Court famously explained in footnote four of United States v. Carolene Products Co., 304 U.S. 144 (1938), that "prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry."  Id. at 153 n.4.  In order to safeguard the interests of such minorities, laws involving certain classifications "require a tighter fit between the discriminatory means and the legitimate ends they serve."  Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 84 (2000).

The most stringent level of scrutiny, "strict scrutiny," is reserved for laws that are inherently suspect, that being laws that categorize individuals on the basis of race, racial classifications, or national origin, or that infringe on a fundamental right.  See, e.g., Graham v. Richardson, 403 U.S. 365, 372 (1971); Loving v. Virginia, 388 U.S. 1, 11-12 (1967); McLaughlin v. Florida, 379 U.S. 84, 191-92 (1964).  Under this standard, "classifications are

constitutional only if they are narrowly tailored measures that further compelling governmental interests." Adarand Constructors, Inc. v. Peña, 515 U.S. 200, 227 (1995). The government must also show that there is no "less restrictive" alternative available to accomplish the compelling interest. The Supreme Court has explained that strict scrutiny is particularly appropriate to laws involving racial classifications, because "racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." Gratz v. Bollinger, 539 U.S. 244, 270 (2003) (internal quotation marks omitted.)

"[D]iscriminatory classifications based on sex or illegitimacy," Clerk v. Jeter, 486 U.S. 456, 461 (1988), however, are "not 'inherently suspect' so as to be subject to 'strict scrutiny,'" and instead, are evaluated under "intermediate scrutiny." "To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective." Id.

If a law does not involve classifications covered by either strict or intermediate scrutiny, it will be evaluated under the least exacting standard, the rational basis test. For such laws, "[t]he rationality commanded by the Equal Protection Clause does not require States to match . . . distinctions and the legitimate interests they serve with razorlike precision," Kimel, 528 U.S. at 83, nor is the Equal Protection Clause violated "merely because the classifications made by [the] laws are imperfect," Mass. Bd. of Retirement v. Murgia, 427 U.S. 307, 316 (1976). Instead, a law under the rational-basis test "will not [be] overturn[ed] . . . unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational." Vance v. Bradley, 440 U.S. 93, 97 (1979).

Whether Defendant's redistricting plan is found to be unconstitutional may well hang on

the question of what level of scrutiny applies.  As Justice Breyer has stated, "strict scrutiny,"

which Plaintiffs urge the Court to apply (Summ. J. Resp. 29-30), is  "a categorization that almost

always proves fatal to the law in question."  <u>Ysursa v. Pocatello Educ. Ass'n</u>, —U.S.—, 129 S.

Ct. 1093, 1102 (2009) (Breyer, J., concurring in part and dissenting in part).  In contrast, an

individual challenging a law evaluated under the rational-basis standard, which, according to

Defendant, should be applied to its redistricting plan (Summ. J. Mot. 26-27), bears the burden of

proving that the "facts on which the classification is apparently based could not conceivably be

true."  <u>Bradley</u>, 440 U.S. at 111.

    **B.**    **Strict Scrutiny Under <u>Seattle</u>**

        **1.**    **Summary of <u>Seattle</u>**

The <u>Seattle</u> decision consolidated two separate challenges to school assignment plans in

Seattle, Washington, and Louisville, Kentucky, that both employed racial classifications to assign

students.  The first school district at issue, that of Seattle, had never been subject to court-ordered

desegregation, but adopted a mandatory busing program in 1978 as part of a formal settlement

agreement with the NAACP.  In 1988, the district replaced the busing program with a student

choice plan.  The Seattle assignment plan at issue in the case was a modification of the 1988 plan

that was adopted in 1998.   This scheme permitted incoming high school students to rank their

preferences among the district's ten high schools, but used a series of "tiebreakers" to fill open

slots at the oversubscribed schools:  first, whether the student had a sibling already attending the

preferred school; second, if the oversubscribed school was not within ten percentage points of the

district's overall White/non-White composition, whether a student's race helped rebalance the

school's composition; and third, the geographic proximity between the student's residence and

the school.   551 U.S. at 711-12.

The second assignment plan at issue in <u>Seattle</u> governed public schools in Louisville,
Kentucky.  In 2000, the court lifted a 1973 court-ordered desegregating decree for Jefferson
County Public Schools, finding that the vestiges of segregation had been essentially eliminated.
<u>Id.</u> at 715-16.  The following year, based on the fact that the district's student population at the
time was thirty-four percent Black and sixty-six percent White, the county adopted a voluntary
assignment plan that required nonmagnet schools to keep Black enrollment between fifteen to
fifty percent.  <u>Id.</u> at 716.  The district designated a "resides" school for each elementary school
student, based on his or her geographic location, which was part of a larger cluster of schools.  <u>Id.</u>
Under the student reassignment plan, parents of kindergarten, first grade, and new students
indicated their top two choice schools within their "resides" cluster.  <u>Id.</u>  Students were then
assigned to a school within the cluster based on the school's available space and whether the
student's race would violate the school's compliance with the Black enrollment guideline.  <u>Id.</u>
Student transfer applications and assignments to middle and high schools were also determined
with reference to the Black enrollment guideline.  <u>Id.</u>

Chief Justice Roberts authored a plurality opinion, which constitutes the majority opinion
for Parts I, II, III.A, and III.C, which Justice Kennedy joined.  As the majority opinion explained,
"[b]oth cases present the same underlying legal question—whether a public school that had not
operated legally segregated schools or has been found to be unitary may choose to classify
students by race and rely upon that classification in making school assignments."  <u>Id.</u> at 711.  Part
III.A of Chief Justice Roberts's Opinion then provided as follows:  (1) strict scrutiny applies to
both reassignment plans, because each involved "government[al] distribut[ion of] burdens or

benefits on the basis of individual racial classifications," id. at 720; (2) neither remedying past discrimination nor achieving diversity in post-secondary education—both of which the Court previously recognized in evaluating the use of racial classifications in schools—was a "compelling" government interest in Seattle, because in Seattle, there has never been, and in Louisville, there no longer remains, a need to remedy past intentional discrimination, id. at 721; and (3) the Court's prior holding in Grutter v. Bollinger, 539 U.S. 306 (2003), upholding the admissions plan for the University of Michigan Law School, did not apply, because that admissions plan had been narrowly tailored based on its "highly individualized, holistic review," and "relied upon considerations unique to institutions of higher education," id. at 723-24.

Next, Part III.C of Chief Justice Roberts's opinion determined that the Seattle and Louisville plans were not sufficiently narrowly-tailored, because they had "only a minimal effect" on increasing diversity," and "failed to show that they considered methods other than explicit racial classifications to achieve their stated goals. Narrow tailoring requires 'serious, good-faith considerations of workable race-neutral alternatives,' and yet in Seattle several alternative assignment plans—many of which would not have used express racial classifications—were rejected with little or no consideration." Id. at 735. As a result, the majority opinion concluded that both plans failed to withstand strict scrutiny, and were unconstitutional under the Equal Protection Clause.

Justice Kennedy's concurring opinion then criticized Part III.B of the plurality opinion, which he did not join, for being "too dismissive of the legitimate interest government has in ensuring all people have equal opportunity regardless of their race," because "[d]iversity, depending on its meaning and definition, is a compelling education goal a school district may

pursue." Id. at 783.  In Justice Kennedy's view, public schools may remain cognizant of racial

diversity, and

> may pursue the goal of bringing together students of diverse backgrounds and races through
> other means, including strategic site selection of new schools; drawing attendance zones
> with general recognition of the demographics of neighborhoods; . . . and tracking
> enrollments, performance and other statistics by race.  These mechanisms are race conscious
> but do not lead to different treatment based on a classification that tells each student he or
> she is to be defined by race, it is unlikely any of them would demand strict scrutiny to be
> found permissible.

Id. at 789.  Justice Kennedy therefore concluded that the school districts had identified a

compelling interest, but nonetheless failed to show how their schemes were narrowly-tailored.

### 2.    Application to the Present Case

Plaintiffs contend that under Seattle, strict scrutiny applies to the case at hand, because

both cases involve racially-motivated student assignment programs.  (Summ. J. Resp. 23, 29-30.)

Although the Supreme Court, both in Seattle and prior cases, has determined that strict scrutiny

applies when "the government distributes burdens or benefits on the basis of individual racial

classifications," 551 U.S. at 720; see also Johnson v. California, 543 U.S. 499, 505-06 (2006);

Grutter, 539 U.S. 306, 326 (2003); Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 224

(1995), this case does not involve the express use of racial classifications.  Unlike the two plans

at issue in Seattle, which explicitly used students' racial classifications in assigning them to

schools, see 551 U.S. at 711-12, 716-17, neither Plan 3R nor its official guiding principles, the

Non-Negotiables, mentions race or racial classifications.  (Undisputed Facts ¶¶ 45, 90, 95, & 99.)

As the Court will explain in more detail infra in conducting its Celotex analysis, whether

Defendant's plan in fact involved considerations of race requires a sensitive factual inquiry,

which will require examination of the relevant direct and circumstantial evidence regarding the

Board's process for adopting Plan 3R.  Cf. Adarand, 515 U.S. at 213 (noting that although the

Court applied strict scrutiny, the case "concerns only classifications based explicitly on race, and presents none of the additional difficulties posed by laws that, although facially neutral, result in racially disproportionate impact and are motivated by a rationally discriminatory purpose"). The Court thus finds the facts of this case distinguishable from those of <u>Seattle</u>, such that strict scrutiny does not automatically apply.

The Court, however, is also unpersuaded by Defendant's argument that, in light of Justice Kennedy's limited concurrence in <u>Seattle</u>, strict scrutiny cannot apply to the reassignment plan in question. Defendant contends that in redistricting, it merely remained cognizant of racial diversity outcomes, which does not demand strict scrutiny, and aimed at overall diversity, which is a compelling government interest, according to Justice Kennedy. (Summ. J. Mot. 1-2, 26-27.) Defendant then avers that Justice Kennedy's views were shared by the four dissenting Justices, thereby constituting controlling law for this Court. (Def.'s Supp. Mem. 2, Docket No. 46.)

Under <u>Marks v. United States</u>, 430 U.S. 188 (1977), "[w]hen a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" <u>Id.</u> at 193-94 (quoting <u>Gregg v. Georgia</u>, 428 U.S. 153, 169 n. 15 (1976)). There is no question that Parts III.A and III.C of Chief Justice Roberts's opinion, which represents the views of a majority of the Court, binds this Court. What is less clear, under <u>Marks</u>, is what weight should be given to the portions of Justice Kennedy's concurrence in <u>Seattle</u> that disagree with Part III.B of Chief Justice Roberts's plurality opinion, namely, whether diversity should be considered a compelling government interest in the secondary school context, and when particular, racially-conscious measures taken by school

districts should not be subject to strict scrutiny, because they do not evince intent to discriminate on the basis of race.[3]  Such determinations would require this Court to decide whether those determinations fall within the "narrowest grounds" of the Supreme Court's decision, id. at 194, and would be speculative.  The Court need not decide this difficult and unresolved issue at this time, although the Court may revisit the issue after trial.[4]

Even assuming arguendo that under Justice Kennedy's concurring opinion, race is an appropriate part of a diversity plan even in the secondary school context, Part III-A of Chief Justice Roberts's opinion, which was supported by a majority, also expressly stated that the Seattle cases, which involved "race-based assignments in elementary and secondary schools,"

---

[3]The difficulty of applying the Marks doctrine to the decision in Seattle is heightened by the fact that it is unclear what role race may play in school assignment policies under Justice Kennedy's view.  On the one hand, Justice Kennedy joined Part III-A of Chief Justice Roberts's opinion, which stated that "race-based assignments in elementary and second schools 'are not governed by Grutter" and should be evaluated under strict scrutiny, 551 U.S. at 725; on the other hand, Justice Kennedy wrote separately, opining in his concurrence that "[d]iversity, depending on its meaning and definition," as recognized in Grutter, "is a compelling education goal a school district may pursue," and requires a more "searching" inquiry into whether strict scrutiny is appropriate, id. at 783.

[4]The Court, however, notes that other courts have begun to weigh in on the issue.  See, e.g., United States v. Alamance-Burlington Bd. of Educ., 40 F. Supp. 2d 670, 683 n.5 (M.D.N.C. 2009) ("[T]his Court has relied on the concurring opinion of Justice Kennedy, as discussed above, in setting out the framework governing the School System going forward."); Hart v. Cmty. Sch. Bd. of Brooklyn, 536 F. Supp. 2d 274, 282 (E.D.N.Y. 2008) ("[T]he view of Justice Kennedy in Seattle, which represents the applicable approach under Marks, [is] the guiding standard on the use of race as one of a number of appropriate admissions factors."); N.N. ex. rel. v. Madison Metro. Sch. Dist., — F. Supp. 2d. —, No. 08-0581, 2009 WL 4067779, at *10 (W.D. Wis. Nov. 24, 2009) ("Because no single opinion in [Seattle] garnered a majority of the Court, Justice Kennedy's opinion is controlling, at least to the extent it represents the narrowest grounds for invalidating the two plans.  Both Grutter and Justice Kennedy emphasized that race may be an appropriate part of a diversity plan when race is considered as only one factor among many." (internal quotation marks and citations omitted)).

"are not governed by Grutter." 551 U.S. at 725. As the Court has already explained, it is far from clear whether race was a motivating factor in redistricting, and thus, whether strict scrutiny under Seattle applies. The pending Motion for Summary Judgment can be granted only if there are "no genuine issue as to any material fact." Fed. R. Civ. P. 56(c)(2). The Court cannot conclude as a matter of law, prior to trial, and absent a sensitive factual inquiry into the underlying direct and circumstantial evidence surrounding the Board's adoption of Plan 3R, that this case does not involve "race-based assignments," as in Seattle, and instead involves a general diversity plan similar to Grutter that is race-conscious, rather than racially motivated.

This case is unlike the post-Seattle cases that have declined to apply strict scrutiny to race-conscious decisions in schools and facially neutral policies, and upon which Defendant relies (Def.'s Supp. Mem. 4-6). As the Court will detail infra in analyzing Defendant's motion under Celotex, this is not a case where "nothing in the record" indicates that race was a motivating factor underlying the facially neutral policy. Friends of Lake View Sch. Dist. Inc. No. 25 v. Beebe, 578 F.3d 753, 762 n. 12 (8th Cir. 2009); see also Reese v. Miami-Dade County, No. 01-3766, 2009 WL 3762994, at *15 (S.D. Fla. Nov. 10, 2009) (finding that plaintiffs failed to show "that the law was motivated by a racial purpose or object, or is unexplainable on grounds other than race" (internal quotation marks omitted)). As for the remaining post-Seattle cases cited by Defendant, these are also factually distinguishable and therefore inapposite to the case at hand. See N.N. ex. rel. v. Madison Metro. Sch. Dist., — F. Supp. 2d. —, No. 08-0581, 2009 WL 4067779, at *14-15 (holding that the municipality could not be held liable under 42 U.S.C. § 1983 for efforts to implement a state racial balancing statute); United States v. Alamance-Burlington Bd. of Educ., 640 F. Supp. 2d 670, 634 (M.D.N.C. 2009) (involving a school system

previously plagued by de jure discrimination and subject to desegregation orders and agreements); Hart v. Cmty. Sch. Bd. of Brooklyn, 536 F. Supp. 2d 274, 282 (E.D.N.Y. 2008) (same).

The Court, therefore, cannot find that strict scrutiny will not apply to Defendant's redistricting plan. Accordingly, the Court will not apply strict scrutiny for purposes of ruling upon the pending Motion for Summary Judgment, and will proceed with its analysis under the Celotex framework.

### C.   Celotex Analysis

Under Celotex, Defendant, as the party moving for summary judgment, bears the burden of showing that no genuine issue of material fact exists. See 477 U.S. at 322. Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 322. Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party

has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in this rule [ ] set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

Notwithstanding Defendant's contentions to the contrary (see Oral Arg. Tr. 7:7-8, 34:11-12, 19-22, 45:19-24), there remain several material facts that are in dispute, including the ones listed below. First, the parties dispute what weight Defendant gave to the Community Values during the redistricting process. Plaintiffs contend that Dr. Haber and the school district in fact used the Community Values, including those relating to racial diversity "to formulate the redistricting plans," as evidenced by numerous statements to the public and Dr. Haber's deposition to this effect. (Undisputed Facts Resp. ¶¶ 54, 56; see also Summ J. Resp. 4-7.) Plaintiffs find further support in copies of Dr. Haber's redistricting proposals, showing that two of these were "eliminated due to inequitable racial balancing" and failure to "support the community value of diversity." (Summ J. Resp., Ex. 25, at LMSD 03933, 26; Ex. 26, at 7.) Defendants contest this, insisting that the Community Values were not mandates, and that the Board members testified at their depositions that they had never seen Dr. Haber's race-related notations. (Summ. J. Reply 3, 10.)

The parties also dispute whether the Board members received data on how Plan 3R would affect student racial diversity prior to the final vote to adopt the plan, and whether the Board

considered such data.  Plaintiffs contend that on January 12, 2009, "just hours before the School Board vote," the Superintendent "forwarded an email to all School Board Members in which he argued that the District was not engaging in 'token' diversity, and . . . set forth the racial breakdown of the student population that would be moved to Harriton High School." (Undisputed Facts Resp. ¶ 102; <u>see also</u> Summ. J. Resp. 14, 26.)  Defendants, however, maintain that "the Board, in making its official decision to adopt Plan 3R, did not consider–and was not even provided–data on race."  (Summ. J. Mot. 11; <u>see also</u> Undisputed Facts ¶¶ 102, 104.)

Moreover, the parties cannot agree about whether the Board attempted to conceal its racial diversity redistricting goals after the fact.  Plaintiffs answer the question in the affirmative, and point to an email the Superintendent's sent to Defendant's media personnel instructing them that "commentary and information concerning diversity" be omitted from the district's redistricting website.  (Summ J. Resp. 19.)  In response, Defendants argue that this is untrue and is belied by the mention of diversity on the same website's "Frequently Asked Questions" page. (Summ J. Reply 14.)

All of these facts are material to the question of whether the Board considered, and was guided by considerations of, race when it adopted Plan 3R.  In addition to these contested issues of material fact, the record, when construed in favor of Plaintiffs, includes many instances in which the Board Members and high-up district officials mentioned race, and in particular, the need for redistricting to address racial imbalance.  Prior to Phase I, the district's outgoing superintendent repeatedly stated, both publicly and to the Board, that he hoped that redistricting would achieve "racial balance."  (Summ. J. Resp. 9-10.)  In particular, he made the following remark at a March 31, 2008 Board meeting:

> I think we have to have some sensitivity to issues such as . . . closing the achievement gap, [when] one of the things that research is telling us is that it's important for children who are, quote, unquote, minority children, like African-American children, to have clusters of classmates and not be divided amongst schools where there are fewer . . . people of color to support each other and to help bolster academic achievement.

(Summ. J. Resp., Ex. 6, at 3:18-4:6.)  He also authored a "Redistricting Process Options" report to the Board in March 2008, which appended an "Additional Thoughts" section that listed on his "personal list of criteria that should be included," "racial balance and/or clustering plan based upon current research and community input."  (Summ. J. Resp., Ex. 1, at LMSD 02975.)  The former superintendent's views appear to be shared by individuals who Plaintiffs contend are the former superintendent's cabinet members, who indicated in an email to top Lower Merion administrators that one of the "Administration Recommended 'Non-negotiables'" was to "[a]ddress minority student assignments."  (Summ. J. Resp., Ex. 3, at LMSD 05473.)

Additional comments came during Phase III, when the new superintendent, Dr. Christopher McGinley, authored a memorandum to the Board on October 31, 2008 criticizing a particular redistricting plan as "creat[ing] a racially-isolated group of African-American Students at Harriton."  (Summ. J. Resp., Ex. 49 at LSMD 04097).  According to the deposition testimony of Board Member David Ebby, "[t]he issue of racial isolation came up [at a Board meeting] when Dr. McGinley" stated that "[e]verything is very similar" in Plans 1 and 4, "but there are more–there's more racial diversity with Plan 1," which is why that Plan was selected.  (Summ. J. Resp., Ex. 42, at 37:11-12, 19-21.).

Also, on August 13, 2008, Superintendent McGinley sent electronic copies of a June 28, 2007 San Francisco Chronicle article on the Supreme Court's decision in Seattle to himself and to Dr. Haber, asking Dr. Haber, "How does our plan connect to this decision if we split Ardmore for high school?"  (Summ. J. Resp., Exs. 76, 77.)  Dr. Haber responded, "As read this decision it

would seem that if someone brought suit that the decision was made on the basis of race the District would lose in court . . . if there were no other pressing needs [sic] to make the change. If you would like I can create a 'color blind' scenario." (Summ. J. Resp., Ex. 77.) Then, on January 12, 2009, hours before the final vote to approve Plan 3R, Dr. Haber emailed the superintendent, stating,

> The issue of race is still out front. I think it is important to emphasize that you hired a consultant who had no horse in this race and the change was simply to balance the enrollments at the high school. That was the driving force. The "non-negotiables" were guidelines in this process and diversity amongst ALL groups was a consideration but not a mandate in the project. We not only considered race when considering diversity but also socio-economic status as well as special needs considerations.

 (Summ. J. Resp., Ex. 79.)

Comments relating to race were also made by the Board Members. On November 12, 2008, Superintendent McGinley remarked in an email to Board Member Lisa Pleskin, "There are no options around the PV-Ardmore section. The only good news its that the section of PV-Ardmore is not predominantly one race. It is a very very mixed community," to which Board Member Lisa Pleskin replied, "That's good to hear. Not the same for PW-Ardmore which is a very non-mixed community . . . ." (Summ. J. Resp., Ex. 46, at LMSD 08504.) Then, on December 9, 2008, during Phase III, Board Member Diane DiBonaventuro, emailed Theodore Lorenz, another Board Member, stating that she "ha[s] been thinking about the diversity (or lack there of [sic]) issues at Harriton," and "believe[s] that moving any of the low income and African American students to Harriton when they can walk to L[ower ]M[erion] simply creates an additional stressor that doesn't need to be there. We are basically asking the AA kids in Ardmore to 'take one for the team' for the AA kids in other areas of the district." (Summ. J. Resp., Ex. 52.) Three days later, DiBonaventuro emailed superintendent McGinley asking,

"What are the diversity numbers?  What if they are way off in this plan?"  (Summ. J. Resp., Ex. 54.)

Defendant contends, rather simplistically, that because the Non-Negotiables and Plan 3R are facially neutral, and because any purportedly racially-related comments were made by individual Board Members, district administrators, or outside consultants, and not by the Board, Plaintiffs cannot show purposeful discrimination.  (Summ J. Mot. 11-15.)  Invidious racial discrimination, however, need not be worn on the sleeve, or carried on signs.  The Supreme Court has clarified that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a <u>sensitive inquiry</u> into such circumstantial and direct evidence of intent as may be available."  <u>Village of Arlington Heights v. Metro. Housing Dev. Corp.</u>, 429 U.S. 252, 266 (1977) ("<u>Arlington Heights</u>") (emphasis added).  The <u>Arlington Heights</u> Court specifically noted that the following pieces of evidence are relevant to this inquiry:  "the historical background of the decision," "[t]he specific sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural sequence," "[s]ubstantive departures," and "[t]he legislative or administrative history . . . , especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  <u>Id.</u> at 267-68.

Under <u>Arlington Heights</u>, the Court cannot find as a matter of law that a fact-finder could ignore all of the Board Members and Administrators' statements and correspondences relating to race leading up to the final vote approving Plan 3R.  In fact, such evidence is exactly the sort of "legislative or administrative history" that the Court can consider.  <u>Id.</u> at 268.  Not only would live testimony by the various Board members, district administrators, and outside consultants

enable the Court to evaluate their credibility, thereby conducting its "sensitive inquiry" into whether the Board purposefully discriminated against Plaintiffs on the basis of race, but also, the Court is particularly reluctant to grant summary judgment and to deny Plaintiffs the right to trial in this case, which involves issues of public policy and great concern to the community. The Court, however, notes that the burden of showing that Defendant's redistricting plan violates the Equal Protection Clause, Section 1981, and Title VI, will remain at all times with Plaintiffs, unless they are able to show evidence of purposeful racial discrimination. Should Plaintiffs make such a showing, strict scrutiny will apply, and the burden will shift to Defendant to show that it had a compelling interest for redistricting as it did, and that its adoption of Plan 3R was narrowly tailored to such an interest.

## IV.    <u>Conclusion</u>

For the reasons detailed above, Defendant's Motion for Summary Judgment will be denied. An appropriate Order follows.

O:\CIVIL 09-10\09-2095 Doe v. Lower Merion\Lower Merion - Memo Summ J.wpd