**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STUDENT DOE 1, et al., | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| LOWER MERION SCHOOL DISTRICT | : | NO. 09-2095 |

## MEMORANDUM ON FACTUAL FINDINGS

**Baylson, J.**                                                              **May 13, 2010**

## TABLE OF CONTENTS

I.    Introduction and Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   Procedural Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      A.   The District. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
           1.   School Board. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
           2.   Superintendent Dr. McGinley. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
           3.   School Administration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
           4.   Affected Area and North Ardmore. . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
      B.   Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      C.   Redistricting Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
           1.   Decision to Redistrict. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
           2.   Redistricting Principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
                a.   Non–Negotiables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
                b.   Community Values. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
           3.   Early Redistricting Planning Stages. . . . . . . . . . . . . . . . . . . . . . . . . . 18
      D.   Proposed Redistricting Scenarios and Plans. . . . . . . . . . . . . . . . . . . . . . . . 19
           1.   Pre–Proposed Plan 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
                a.   African–American Student Data. . . . . . . . . . . . . . . . . . . . . . . 22
                b.   Elimination of Scenarios 1 and 4A. . . . . . . . . . . . . . . . . . . . 24
                c.   Awareness of Seattle. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
           2.   Proposed Plan 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
                a.   Likelihood of Randomized Student Assignment. . . . . . . . . . . 27
                b.   General Diversity Data. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
                c.   Redistricting Press Release. . . . . . . . . . . . . . . . . . . . . . . . . 28
                d.   Decisions to Not Present Diversity Data. . . . . . . . . . . . . . . . 29

          e.     Race–Related Comments Regarding Proposed Plan 1. . . . . . . . 30  
          f.     Rejection of Proposed Plan 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31  
      3.     Proposed Plan 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33  
          a.     Rejection of Proposed Plan 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . 33  
          b.     Race–Related Comments Regarding Proposed Plan 3. . . . . . . . 34  
             i.     Dr. McGinley's and Lisa Pliskin's Comments. . . . . . . . 35  
             ii.    David Ebby's Comments. . . . . . . . . . . . . . . . . . . . . . . . . . 37  
             iii.   Diane DiBonaventuro's Comments. . . . . . . . . . . . . . . . . 37  
      4.     Proposed Plan 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38  
      5.     Proposed Plan 3R. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41  
          a.     Race–Related Comments Regarding Proposed Plan 3R. . . . . . . 44  
          b.     Diversity Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45  
  E.    Adoption and Implementation of Proposed Plan 3R. . . . . . . . . . . . . . . . . . . 46  
      1.     Board Members' Reasons for Voting for or Against Plan 3R. . . . . . . . . 47  
          a.     Board Members Supporting Plan 3R. . . . . . . . . . . . . . . . . . . . . . 47  
          b.     Diane DiBonaventuro. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48  
          c.     David Ebby. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49  
      2.     High School Enrollment Data. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50  

IV.   <u>Factual Conclusions</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50  

V.    <u>Further Proceedings</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55  

VI.   <u>Legal Issues To Be Briefed and Argued</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56  

## I.    **Introduction and Summary**

Plaintiffs Students Doe 1 through 9 ("Students") are African–American students who live in Lower Merion School District ("District"), which is located in Montgomery County, Pennsylvania. The Students, by and through Parents/Guardians Doe 1 through 10 ("Parents," collectively with Students, "Plaintiffs"), allege that the District discriminated against them based on their race, by adopting a redistricting plan in January 2009 that took away their ability to choose to attend either of the District's high schools, Harriton and Lower Merion, and required them to attend Harriton High School. On February 24, 2010, this Court denied the District's

Motion for Summary Judgment.  Doe v. Lower Merion Sch. Dist., —F. Supp. 2d.—, 2010 WL 701677 (E.D. Pa. Feb. 24, 2010).  Beginning on April 8, 2010, this Court held a nine–day bench trial.  (Docket Nos. 89–94, 97–104.)

Following trial, the Court finds that race was one of several factors motivating the School Administration, as it developed and recommended redistricting plans.  The Administration's recommendation to the Board, to redistrict Plaintiffs to Harriton High School, was based largely on the fact that Plaintiffs' neighborhood of residence has a heavy concentration of African–American students, and that Harriton had a significantly lower African–American student population than Lower Merion High School prior to redistricting.  Like a leitmotif in a Wagner opera, a recurring theme with variations, the process of redistricting repeatedly embraced the goal of achieving racial parity between the two high schools.  As Justice Holmes stated in Schenck v. United States, 249 U.S. 47, 52 (1919), "the character of every act depends on the circumstance in which it is done."  The circumstantial evidence introduced at trial leads, like a well–worn path through the woods, inescapably to the finding that race was a motivating factor for the Administration.

The Board Members who voted to approve Plan 3R were not aware that racial considerations had played such a significant role within the Administration.  Both Lower Merion and Harriton High Schools are excellent schools.  Whether Plaintiffs are entitled to relief will turn in large part upon the interpretation of the Supreme Court's decision in Parents Involved in Community Schools v. Seattle School District No. 1, 551 U.S. 701, 723 (2007) ("Seattle").  This Memorandum sets forth the Court's findings of fact pursuant to Federal Rule of Civil Procedure 52(a).  Further briefing from the parties on the legal issues which stem from these findings of fact

will lead to a final judgment.

## II. **Procedural Background**

The Court's February 24, 2010 Memorandum denying the District's Motion for Summary Judgment summarized the relevant factual and procedural background. See Doe, 2010 WL 701677, at *1–4. A concise summary of the relevant procedural background is provided below.

On May 14, 2009, Plaintiffs filed a complaint alleging that the District's adoption of a redistricting plan in January 2009 violates the Equal Protection Clause of the Fourteenth Amendment (Count I), 42 U.S.C. § 1981 (Count II), and Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et seq. (Count III), all pursuant to 42 U.S.C. § 1983, by discriminating against the Students based on their race. (Docket No. 1.) The Court denied the District's Motion to Dismiss, or in the Alternative, for a More Definite Statement. (Docket No. 7.) Plaintiffs then moved for preliminary injunctive relief restoring their choice to attend either high school, but subsequently agreed to withdraw this request. (Docket Nos. 5, 26.).

On December 31, 2009, after the parties completed discovery, the District filed a Motion for Summary Judgment (Docket No. 32), which the Court denied on February 24, 2010, following oral argument, on the basis that there were numerous contested issues of genuine material fact, Doe, 2010 WL 701677, at *10-13.

In February 2010, Richard Ilgenfritz, a reporter for Main Line Media News, and Philadelphia Newspapers, LLC, also filed Motions seeking to intervene and to be granted access to the judicial records, several of which had been filed under seal. (Docket Nos. 48, 51.) The Court granted Ilgenfritz's and Philadelphia Newspapers, LLC's motions and ordered counsel to make the briefs and exhibits available in the clerk's office, and to substitute specific pages of

exhibits that redact Plaintiffs' or third parties' personal identifying information. (Docket No. 52.) In addition, the parties filed Proposed Findings of Fact and Law. (Docket Nos. 84–86.)

Prior to trial, Plaintiffs and the District filed several Motions in Limine seeking to strike or to bar the admission of various exhibits and the testimony of several witnesses (Docket Nos. 65, 69, 71, & 73), and Plaintiffs filed a Motion to Proceed Pseudonymously (Docket No. 72). On April 5, 2010, the Court granted the latter Motion, but denied the Motions in Limine without prejudice. (Docket No. 88.)

On May 3, 2010, following the close of testimony, the Court held oral argument on the parties' proposed findings of fact. (Docket No. 111.) Subsequently, the District filed Amended Proposed Findings of Fact. (Docket No. 112.)

## III.    Findings of Fact

The principal factual question the Court must resolve is whether race was a motivating factor in the District's January 2009 redistricting decision. The Supreme Court has made clear that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a <u>sensitive inquiry</u> into such circumstantial and direct evidence of intent as may be available." <u>Village of Arlington Heights v. Metro. Housing Dev. Corp.</u>, 429 U.S. 252, 266 (1977) ("<u>Arlington Heights</u>") (emphasis added). In conducting this inquiry, this Court will examine the evidence presented during the bench trial and make factual determinations as to the District's decision–making process, without the benefit of a written transcript. However, the digital audio recordings of the trial have been consulted.

At trial, Plaintiffs presented twenty–six witnesses: eight Parents Doe; District Superintendent Dr. Christopher McGinley; six other members of the District's Administration;

all nine District School Board Members; the District's redistricting consultant, Dr. Ross Haber; a computer graphics artist, Dr. James B. Speer; an expert in applied mathematics, Dr. Pavel Greenfield; and a member from the community in which Plaintiffs live, Reverend Albert G. Davis, Jr.  By agreement, the District's counsel questioned these witnesses on all topics, even beyond the scope of direct examination, so that they did not have to be recalled as witnesses for the District.  In addition, the District had two witnesses, Dr. Claudia Lyles and Dr. Robert Lee Jarvis, testify as to Dr. McGinley's prior work on "combating the achievement gap," which will be detailed in the next section.  Except as noted below, the witnesses were generally credible.

### A.    The District

The District operates six elementary schools (Belmont Hills, Cynwyd, Gladwyn, Merion, Penn Valley, and Penn Wynne), two middle schools (Bala Cynwyd and Welsh Valley), and two high schools (Harriton High School and Lower Merion High School).  Both of the high schools are ranked as being among the best in the state, if not the nation.

#### 1.    School Board

Nine elected School Directors ("Board Members") make up the Lower Merion Board of School Directors ("Board"), which has been vested with the authority to assign students to schools within Lower Merion.  During the January 2009 redistricting process, the Board was composed of the following individuals:  Diane DiBonaventuro, President of the Board from December 1, 2007, to December 1, 2008; Lisa Pliskin, President from December 1, 2008, to December 1, 2009; David Ebby, the current President; Linda Doucette–Ashman; Gary J. Friedlander; Susan Guthrie; H. Linda Kugel, Ted Lorenz; and Gerald Gene Novick.

#### 2.    Superintendent Dr. McGinley

Dr. Christopher McGinley has been the District's Superintendent since June 2008, although he began attending some redistricting meetings in April 2008. His predecessor was Dr. Jamie P. Savedoff. Several of the Board Members testified that they had voted to hire Dr. McGinley because he was a "true educator" who was "student–focused" and personable, and because he had a wealth of experience and success in combating the minority student "achievement gap."

Various witnesses, including Dr. McGinley, Dr. Lyles, and Dr. Jarvis testified that the "achievement gap" refers to the observed and pervasive disparity in measurable educational achievement among groups of students. Research on the achievement gap across the nation, as well as specifically in the District, shows that African–American and Latino students as a whole perform significantly poorer than their White and Asian–American peers. "Combating the achievement gap," therefore, refers to valid and appropriate educational policies aimed at minimizing and eradicating the achievement gap.

Dr. Lyles and Dr. Jarvis testified that prior to working for the District, Dr. McGinley was Assistant Superintendent at Cheltenham Township in Montgomery, Pennsylvania, where he was a "pioneer" and "leader" in combating the achievement gap. In particular, Dr. McGinley helped implement initiatives to eliminate class tracking after second grade, and to use demonstrated performance, such as test scores and report cards, to place students, thereby taking away teacher subjectivity. Both initiatives resulted in a significant decrease in the achievement gap in Cheltenham schools. In addition to this work, Dr. McGinley helped form a partnership with the University of Pennsylvania to create the Delaware Valley Minority Student Achievement Consortium ("Consortium"), which is an organization dedicated to eliminating the achievement gap by educating educators on the subject, and studying techniques to combat, and the causes of,

this phenomenon.

In addition to combating the achievement gap, Dr. McGinley and the Consortium have done work to minimize "racial isolation," which is the isolation a student feels because he or she is one of only a few students of his or her particular background in the class. Witnesses including Dr. McGinley testified that racial isolation is not triggered by a particular "threshold" of students, or lack thereof, from a particular background in a given classroom, and is not necessarily affected by the number of minorities in a given school. Since being the District's Superintendent, Dr. McGinley has put in place a "clustering" program whereby the District places students of a given minority background, who have agreed to participate in the program, together in language honors classes, with the goal of having the same percentage of minority students in each class as the percentage of the individuals of that minority background in the local community. This "clustering" program has been successful at increasing the number of minorities, and in particular, the numbers of African–American students, in language honors programs in the District.

### 3.     School Administration

The District has an Administration, which includes the Superintendent and several "cabinet members" who have district–wide responsibilities. During the redistricting process, Dr. McGinley's cabinet included the following individuals: Dr. Michael J. Kelly, Assistant Superintendent; Edward Andre, Director of Transportation; Scott A. Shafer, Business Manager; Pat Guinnane, Director of Human Resources; and Doug Young, Director of Public Relations.

Plaintiffs called as witnesses a number of District Administrators who testified as to their role in putting together the various redistricting plans. Most of this testimony concerned programmatic, logistical, and transportation issues. For example, Dr. Kelly, the District's

8

Assistant Superintendent testified at length about how during redistricting, the Administration was concerned about not increasing the number of buses, due to the increased fuel, storage, and employee costs that would result. In addition, Dr. McGinley testified that throughout redistricting, the Administration worried about how to transport students to the high schools given the limited number of buses, and that as a result, the Administration considered staggering school start times in order to reuse existing buses. Edward Andre, the District's Director of Transportation, then testified that there were limitations on bus storage facilities, which prevented the District from increasing the number of buses. Although this testimony provided helpful background, it is not deserving of significant weight in the Court's determination as to the motivations underlying the redistricting process.

### 4. Affected Area and North Ardmore

As Parents Doe 2, 3, 4, 5, 7, 8, and 9 confirmed in their testimony, all of Plaintiffs live in the District in what is known as "South Ardmore," which is bounded by Athens Avenue, Lynnwood Road, County Line, and Cricket Avenue. This area has been referred to throughout this case as the "Affected Area." In addition to the Affected Area, Ardmore contains an area referred to at trial as "North Ardmore"[1] which is North of Cricket Avenue, and is bounded by East Lancaster Avenue, County Line Road, and just below College Lane. (Pls.' Ex. 154, at ¶ 14.)

Several witnesses, including numerous Board Members, testified that both the Affected

---

[1] Although this Memorandum refers to the area described in the text as "North Ardmore," at least three witnesses, Board Member David Ebby, Transportation Director Edward Andre, and Reverend Davis, testified that they consider this area, along with the Affected Area, as comprising a single neighborhood called "South Ardmore."

Area and North Ardmore contain heavy concentrations of African–American families,[2] and that the only other area of the district with a high concentration of African–American families is in Bryn Mawr.[3] Decades earlier, students in the Affected Area and North Ardmore attended an elementary school in Ardmore, but that elementary school was torn down. Subsequently, students in the Affected Area and North Ardmore were split up and bused to five of the District's elementary schools. In the 1990's, in response to the Ardmore community's call for a community school, the district redistricted these students to attend two elementary schools.[4] In particular, students in the Affected Area were districted for Penn Valley Elementary School and Welsh Valley Middle School, and those in North Ardmore were districted for Penn Wynne Elementary School and Bala Cynwyd Middle School. Originally, students in both areas had the

---

[2]Assistant Superintendent Michael Kelly submitted a declaration indicating that as of September 2008, the Affected Area had 308 students in kindergarten through to grade 12, of which 140 are White, 140 are African–American, 9 are Asian–American, and 18 are Hispanic–American. At this time, North Ardmore had 167 students in kindergarten through to grade 12, of which 32 are White, 107 are African–American, 12 are Asian–American, and 16 are Hispanic–American. (Pls.' Ex. 154, at ¶¶ 13–14.)

[3]This conclusion is not contradicted by, and in fact, appears to be in line with, the testimony of Dr. Speer, who prepared graphical representations of the concentrations of all African–American in the different areas within Lower Merion, as reflected in census data from 2000. (See Pls.' Exs. 192–193.) Dr. Speer testified that the highest concentration of African–American individuals in Lower Merion is in the Affected Area and North Ardmore, with the next highest concentration being in Bryn Mawr. The Court, however, finds that Dr. Speer's testimony, though credible, and the exhibits that he prepared, are of limited significance, because he used data that predated the redistricting process by several years and that reflects the general population, without providing solely the data, or breaking down the data, to isolate the number of children who attend public school.

[4]Reverend Davis suggested in his testimony that there is reason to question whether race played a motivating factor in the District's decisions to close the elementary school in Ardmore, and to redistrict students from Ardmore to Penn Valley and Penn Wynne Elementary Schools, rather than to a single elementary school. Because this case only presents the question of whether the January 2009 redistricting process was motivated by race, the Court will not examine the motivations underlying prior redistricting decisions.

choice to attend either Harriton High School or Lower Merion High School.  After the January 2009 redistricting, the student assignments remained unchanged, except that students in the Affected Area were districted for Harriton, without the choice to attend Lower Merion High School.

### B.     Plaintiffs

Parents Doe 2, 3, 4, 5, 7, 8, and 9 testified on behalf of themselves and their children, Students Doe 1 through 9.[5]  The Parents' testimony confirms that with the exception of Student Doe 4, who elected to attend Harriton High for the 2009–2010 academic year, the Students attend Penn Valley Elementary School or Welsh Valley Middle School.[6]  All Students Doe are bused to their current schools, along with students of all races from the Affected Area.  Several of the Students live within a mile of Lower Merion High School.[7]  The Parents Doe testified that they believed that the District adopted its January 2009 redistricting plan on the basis of race.  Three of the Parents Doe clarified that they believe that their Ardmore neighborhood has been split such that the students in half of the neighborhood, including their children, no longer have a choice to attend either of the District's high schools.  In addition, three Parents Doe attended board meetings concerning redistricting, one of whom publicly stated at board meetings that he

---

[5]Parent Doe 10, the only Parent Doe who did not testify at trial, did not have any conversations with Board Members or members of the Administration concerning the redistricting process.  (Def.'s Am. Proposed Findings of Fact ¶ 71.)

[6]In particular, five of the Students attend Penn Valley Elementary School, and three attend Welsh Valley Middle School.

[7]Parents Doe 1, 2, 7, 8, and 9 testified that they and their children, Students Doe 1, 2, 6, 7, 8, and 9, live within a mile of Lower Merion High School.  Based on the approximate locations that the Parents Doe provided at trial, Michael Andre, the District's Director of Transportation confirmed that at least three Students Doe live within a mile of Lower Merion High School.  (See Pls.' Ex. 129, at 3571 (map pinpointing exact mile measurements from Lower Merion High School to points in Ardmore).)

believed the plans were racially–motivated, and met with Dr. McGinley to discuss his concerns.

## C.     Redistricting Process

### 1.     Decision to Redistrict

In 1997, the District began a capital improvement program to modernize each of its ten schools.  (Def.'s Ex. 11.)  As of 2004, the community recognized that both Lower Merion High School and Harriton High School were outdated and required significant physical plant investments.  (Def.'s Ex. 11, at 2759, 2761.)  In May 2004, a forty–five member Community Advisory Committee ("CAC") made up of school, community, and other interested individuals, examined how to modernize the high schools.  (Def's Ex. 11.)

The CAC considered several plans:  (1) creating one separate high school for only grade nine, and another for grades ten through twelve; (2) building a new, single high school of 2,500 students; (3) building two new high schools, keeping their present student populations of 900 and 1600 students in tact; and (4) building two new high schools, but balancing their student enrollment levels, with 1,250 students per school.  (Def.'s Ex. 11, at 2760–63.)

The CAC rejected the first three proposals.  As for the first plan of having high schools for different grade levels, the CAC determined that no educational arguments strongly favored this proposal, and that the proposal would add another transition for students from ninth to tenth grade, while adversely affecting co–curricular activities.  (Def.'s Ex. 11, at 2762.)  The CAC then determined that having a single school of 2,500 students did not have the advantages of smaller schools, including the greater sense of community, better student–faculty relations, increased opportunities for co–curricular activities, and better educational outcomes.  (Def.'s Ex. 11, at 2762.)  In addition, a single District high school would not fit on either existing high school sites, would create significant traffic problems, would require increased busing of students to off–site

athletic fields, and would violate impervious coverage allowances. (Def.'s Ex. 11, at 2762.) As for having two unequally sized high schools, the CAC determined that this proposal did not address differences in the high schools' educational offerings, evidence indicates that smaller schools produce better outcomes, and thus, having Lower Merion High School remain the larger high school would perpetuate existing traffic and parking problems at the site. (Def.'s Ex. 11, at 2762.)

The CAC voted in favor of a plan to build two high schools of equal enrollment capacity. (Def.'s Ex. 11, at 2792–93.) The CAC concluded that this plan allowed students to benefit from the smallest possible schools, because small schools have the benefit of a stronger sense of community, better student–faculty interactions, and better educational outcomes. In addition, the CAC determined that this option provided students with the most equitable access to programs and facilities, because each school would offer the same range of courses, and would have its own co–curricular activities. The CAC then determined that equal–size schools make the best use of the existing school sites, and alleviated the current traffic and parking problems at Lower Merion High School, which force cars to seek parking in surrounding residential areas. (Def.'s Ex. 11, at 2792–93.)

The Board accepted this recommendation; however, because the District had to keep the high schools at their existing locations, having no other possible sites, equalizing enrollment at the two high schools would require redistricting in order to eliminate the 700–student disparity between the high schools. (Def.'s Ex. 11, at 2759.)

Prior to redistricting, forty–six African–American students attended Harriton, comprising 5.7 percent of Harriton's total student population, and in the District as a whole, approximately ten percent of the high school students were African–American. Students who were districted to

attend Belmont Hills, Gladwyne, or Penn Valley Elementary Schools, including the Affected Area, would attend Welsh Valley Middle School, and then, with the exception of those who lived in the Narberth Borough of Belmont Hills, and the Haverford and Affected Area portions of Penn Valley, would go on to attend Harriton.  (Pls.' Ex. 1, at 0040.)  Students districted to attend Cynwyd, Merion, and Penn Wynne Elementary Schools were districted to attend Bala Cynwyd Middle School, and would also attend Lower Merion High School, alongside students who lived in Narberth Borough, Haverford, and the Affected Area.  (Pls.' Ex. 1, at 0040.)   All students districted to attend Lower Merion High School had the choice to attend either high school.

Although Harriton had in place two magnet programs that aimed to attract more students, namely the International Baccalaureate ("IB") program, and a program that allows students to take college–level classes at Penn State University, Lower Merion High School always had a substantially higher student enrollment than Harriton High School.  Accordingly, the District was faced with the problem of increasing the overall student population at Harriton.  In addition, Harriton is located away from the center of the student population, which is concentrated along the City Avenue corridor, the eastern–most boundary of Lower Merion Township, while Lower Merion High School is closer to the center of the student population.  (Pls.' Ex. 2, at 0280, 4, at 0187, & Def.'s Ex. 11, at 2784, 2759.)

With the exception of areas within a mile of District schools that are designated as walk zones, all areas of the District, including the Affected Area, have always received bus service provided by the District.  From as early as 1983, Lower Merion High School has had a historic walk zone; Harriton High School, however, does not have a walk zone, because the area around the school was deemed to be hazardous.  Harriton is the only school in the District without a

walk zone.

## 2. Redistricting Principles

The Board authorized the Administration to develop Proposed Plans for redistricting, and to choose plans for the Board to consider. Before the Administration did so, the Board decided to come up with a list of "Non–Negotiables" that must guide the redistricting process.

### a. Non–Negotiables

The Administration, which was comprised of many individuals who had worked for the District during the last redistricting in the 1990's, recommended several Non–Negotiables to the Board, which included a recommendation to address the "distribution of minority students." (Pls.' Exs. 36, 37, & 39.) District Business Manager Scott Shafer testified that such language only intended to communicate that the Board could not have a policy respecting minority assignment, given that it is illegal to do so. Shafer's testimony is not credible: Not only does it contradict the plain language of the Administration's recommendations, but also, such testimony is belied by Pat Guinnane's testimony that "someone" in the cabinet had the goal of addressing minority student assignments. In addition, outgoing Superintendent Savedoff wrote a report indicating that his "personal list of criteria that should be considered" included "racial balance and/or clustering plan based upon current research and community input." (Pls.' Ex. 35, at 2975.)

Notwithstanding the fact that the Administration's recommended race–related criterion, if adopted as a Non–Negotiable and followed, would have impermissibly allowed race to be a factor in redistricting, the Board did not accept the Administration's recommendation. Instead, on April 21, 2008, the Board adopted the following "Non–Negotiables":

(1) "The enrollment of the two high schools and two middle schools will be equalized;"

15

(2) "Elementary students will be assigned so that the schools are at or under the school capacity;"

(3) "The plan may not increase the number of buses required;"

(4) "The class of 2010 will have the choice to either follow the redistricting plan or stay at the high school of their previous year" (i.e. the principle of "grandfathering"); and

(5) "Redistricting decisions will be based upon current and expected future needs and not based on past practices." (Pls.' Ex. 5, at 4757–62.[8])

These Non–Negotiables do not reference race or minority student assignments. Each Non–Negotiable stated a valid, educational purpose that was legitimate and non–discriminatory, and Plaintiffs do not dispute this.

Moreover, Board Member David Ebby credibly testified that Dr. Savedoff, for fear of "tie[ing] the hands of his successor" and out of a desire to avoid the "wasp's nest" that redistricting presented, was "not at all" involved in the redistricting process, which several witnesses testified as beginning in the summer of 2008, when Dr. McGinley was Superintendent. Dr. Savedoff's personal desire for redistricting to address minority student assignment, therefore, is not highly significant.

### b. Community Values

Beginning in May 2008, the District hired two outside consultants, Dr. Harris Sokolov and Ellen Petersen, who held a series of public forms and collected online surveys to compile a list of values identified by Lower Merion residents that should "inform" the redistricting process. (Pls.' Ex. 144.) This process involved asking citizens to identify what features they liked about the District. (See Trial Tr. Apr. 26, 2010 (testimony of Susan Guthrie).) On July 11, 2008, Dr.

---

[8]In referring to pages of the parties' exhibits, the Court will only provide the last four digits of the bates numbers, rather than the lengthier, full bates numbers.

Sokolov and Petersen presented to the Board their report, which identified five "values–based principles" ("Community Values"), including "explore and cultivate whatever diversity–ethnic, social, economic, religious and racial—there is in Lower Merion."[9]  (Pls.' Ex. 144, at 0114–15.)  The Board accepted Dr. Sokolov and Petersen's report.  (Pls.' Ex. 158, 54:8–13.)

During the trial, witnesses presented conflicting testimony respecting the role that the Community Values played in the redistricting process.  Dr. McGinley and several Board Members testified that the Community Values, unlike the Non–Negotiables, were never mandates that had to be met by proposed redistricting plans, but that these values merely informed the redistricting process.  These witnesses testified that many of the Community Values, including that respecting diversity, were meant to apply only at the implementation phase, after a redistricting plan had been selected by the Board.

Nonetheless, Dr. McGinley and the Board conceded that they never indicated to the public that they would not honor the Community Values, and instead made several statements to one another and to the public indicating that the Community Values were taken into account in selecting proposed redistricting plans.  (See, e.g., Pls.' Exs. 1, 3, 60, 67, 89, 113, 145, 151, 164, & 170.)  For example, at a public School Board meeting in October 2008, Dr. McGinley, in explaining the "process that we've been engaged in regarding redistricting," and discussing the Community Values identified by Dr. Sokolov and Petersen's report, stated that "the Administration and our consultant were also charged with the responsibility of looking at the

_____

[9]The remaining Community Values are as follows:  (1) "Social networks are at the heart of where people live, and those networks expand as people grow older;" (2) "Lower Merion public schools are known for their excellence:  academic as well as extracurricular;" (3) "Those who walk should continue to walk while the travel time for non–walkers should be minimized;" and (4) "Children learn best in environments when they are comfortable—socially as well as physically."  (Pls.' Ex. 144, at 0114–15.)

issue of diversity when we come up with a plan, to think about that as something that should guide our work and be something that we consider as we move forward." (Pls.' Ex. 162, at 2:7–8, 7:5–11.) At trial, Dr. McGinley explained that this statement only indicated that he was cognizant of the need for schools to welcome newcomers, and that he was only indicating that the Administration was not ignoring diversity. Nonetheless, Dr. Haber, who would later work with the District, testified that he was aware of, and used, the Community Values, and that he considered the diversity–related Community Value in coming up with proposed redistricting plans.

The District cannot be faulted for soliciting the community's input. Obviously, the Community Value respecting walkability and minimizing travel time to the school represents a valid, educational goal. In addition, the Board could not preclude discussions of race. By having a Community Value respecting diversity, the Board could properly consider the general concept of diversity. The testimony is disputed as to whether the diversity–related Community Value, to the extent that it included race, influenced the District's Administration in making its proposals, and the Court will now turn to the redistricting process to determine how the Community Value of diversity was used, and in particular, whether racial diversity–related considerations motivated the District's decision–making process.

### 3.    Early Redistricting Planning Stages

The redistricting planning process then began in the summer of 2008 and ended on January 12, 2009, when Proposed Plan 3R was adopted. In June 2008, Board Members and Administrators met "to answer questions prior to scheduling [a] meeting with the public." (Pls.' Ex. 40, at 4628.) The meeting discussed the major "restrictions and limitations" governing the redistricting process, but also indicated that in "dealing with projections," "[s]uggested

18

boundaries were presented," and "considerations such as 'neighborhoods' [and] 'ethnicity' were discussed." (Pls.' Ex. 40, at 4629.) It is unclear to the Court what discussion respecting diversity the Board had, because none of the witnesses who testified could recall ethnicity being considered at the meeting in question.

In June 2008, the School Board also hired Dr. Ross Haber, of Ross Haber Associates, Inc., to review and analyze District enrollment data, and to propose redistricting plans. (Pls.' Ex. 1, at 0027, 2, at 0276.) Board Members testified that Dr. Haber was selected to be the District's redistricting consultant, because he had proprietary Geographic Information Software ("GIS") that allowed him to use student information maintained by the district—namely the students' identification numbers, names, addresses, race, ethnicity, special needs status, and socioeconomic status, as measured by participation in free and reduced lunch programs—to create proposals for redistricting. (Pls.' Exs. 41, at 4654, 143, & 185, at 72–74.) Dr. Haber worked with the Administration to create various redistricting plans, called Scenarios.

### D.     Proposed Redistricting Scenarios and Plans

Over the course of redistricting, eight sets of Scenarios, of which some had additional variations, were prepared by Dr. Haber, and considered by the Administration. Of the Scenarios, the Administration chose four Proposed Plans (1, 2, 3, and 3R) to present to the Board at public Board meetings, where they were publicly discussed by the Board and members of the community, and after which public comments on each Plan were solicited. Only Plan 3R was voted upon by the Board.

Although four Board Members were present at a July 23, 2008 meeting when Dr. Haber

presented Scenarios to the Administration prior to the selection of Proposed Plan 1,[10] the

Scenarios were not presented to, or voted upon by, the whole Board, nor do the Board Members

at the meeting recall the initial Scenarios that Dr. Haber presented to them.  (Pls.' Exs. 48, 49.)

Accordingly, the Court has determined that the Scenarios are of minor importance to the

determination of whether race was a motivating factor in the redistricting process.  The Court,

therefore, will focus its findings on the evidence respecting the Proposed Plans considered by the

Board.

The following chart provides a brief comparison of the Scenarios and Proposed Plans:

| | Scenario 1 (Pls.' Ex. 6) | Scenario 2 (Pls.' Ex. 7) | Scenario 3 Series (Pls.' Ex. 7, 8) | Scenario 4 (Pls.' Ex. 10) | Scenario 4a (Pls.' Ex. 11) | Scenario 5 (Pls.' Ex. 12) | Scenario 7 Series (Pls.' Ex. 2, 13-15) | Scenario 8 (Pls.' Ex. 3, 16, 17) | Plan 3R (Pls.' Ex. 4, 5) |
|---|---|---|---|---|---|---|---|---|---|
| Plan # | — | — | Plan 1 (Pls.' Ex. 1) | — | — | — | Plan 2 | Plan 3 | |
| Period of considera-tion | Pre-Plan 1 | | | | | | Pre-Plan 2 | Pre-Plan 3 | Post-Plan 3 |
| Type of Diversity Data Provided | African-American only | African-American only | African-American only | African-American only | General diversity data (race, ethnicity, socio-economic disability) | African-American only | General diversity data (race, ethnicity, socio-economic disability) | General diversity data (race, ethnicity, socio-economic disability) | Only projected general diversity data (race, ethnicity, socio-economic disability) |

---

[10]Dr. McGinley's notes indicate that Diane DiBonaventuro, Susan Guthrie, Linda Doucette–Ashman, and Lisa Pliskin were present at the July 23, 2008 meeting.  (Pls.' Ex. 49, at 1561.)

| | Scenario 1 (Pls.' Ex. 6) | Scenario 2 (Pls.' Ex. 7) | Scenario 3 Series (Pls.' Ex. 7, 8) | Scenario 4 (Pls.' Ex. 10) | Scenario 4a (Pls.' Ex. 11) | Scenario 5 (Pls.' Ex. 12) | Scenario 7 Series (Pls.' Ex. 2, 13-15) | Scenario 8 (Pls.' Ex. 3, 16, 17) | Plan 3R (Pls.' Ex. 4, 5) |
|---|---|---|---|---|---|---|---|---|---|
| **Plan #** | — | — | **Plan 1** (Pls.' Ex. 1) | — | — | — | **Plan 2** | **Plan 3** | |
| Total High School Projected Enrollment | Harriton: 1119 Lower Merion: 1269 | Harriton: 1118 Lower Merion: 1270 | Harriton: 1108 Lower Merion: 1137 | Harriton: 1192 Lower Merion: 1196 | Harriton: 1080 Lower Merion: 1194 | Harriton: 1195 Lower Merion: 1193 | Harriton: 1135 Lower Merion: 1139 | Harriton: 1089 Lower Merion: 1185 | Actual Enrollment as of December 2008: Harriton: 897 Lower Merion: 1401 (Pls.' Ex. 155) |
| # African–American Students at Harriton | 162 | 104 | 110 | 103 | 47 | 103 | 88 | 105 | 74 |
| % African—American Students at Harriton | 14.5% | 9.3% | 9.9% | 8.6% | 4.4% | 8.6% | 7.8% | 9.6% | 8.2% (with grandfather-ing) |
| Areas Redistricted for Harriton | -Penn Wynne North of Remingt-on Rd (includes North Ardmore) - Penn Valley (includes Affected Area but excludes walk zone) | -Penn Wynne (includes North Ardmore) - Penn Valley (includes Affected Area) | - Penn Wynne (includes North Ardmore) - Penn Valley (excludes Ardmore) | - North Ardmore - Penn Valley (excludes Affected Area&Ha-verford) - Cynwyd | Includes (no full plan provided) | - Merion (portion) - Cynwyd (portion) -North Ardmore - Penn Valley (Affected Area,Hav-erford, Penn Valley) | - Penn Valley (includes Penn Valley, Haverford excludes Affected Area) - Penn Wynne (incl. N. Ardmore) - Narber-th Borough of Belmont Hills - Merion (portion) | - Penn Valley (includes Affected Area but excludes walk zone) - Narber-th Borough of Belmont Hills | - Penn Valley (includes Affected Area but excludes historic walk zone) - Narberth Borough of Belmont Hills |
| - North Ardmore? | Y | Y | Y | Y | N | Y | Y | N | N |
| - Affected Area? | N | Y | N | N | N | Y | N | Y | Y |

*Note: There is a disparity in the numbers for Scenario 3 and Plan 1. This chart uses the numbers for Plan 1.

### 1.      Pre–Proposed Plan 1

Prior to selecting Proposed Plan 1, the Administration considered five scenarios, Scenarios 1 through 5, and modifications to Scenarios 2, 3, and 4.  (Pls.' Ex. 151, at 0064–65.)

### a.      African–American Student Data

For Scenarios 1 through 5, the handouts Dr. Haber prepared for the Administration included only the number of African–American students, excluding any other racial or ethnic data, and data respecting socio–economic status and disability.  (Pls.' Exs. 6–8, 10, & 12.)  Dr. Haber testified that although he was never directed to create or change a redistricting scenario based on its diversity outcomes, he must have provided only African–American data for Scenarios 1 through 5 because the Administration had expressed concerns respecting the African–American population.  In addition, Dr. McGinley handwrote the projected African–American high school populations on his copies of the handouts for Scenarios 1, 2, and 3, further indicating that of the diversity data, only African–American student projections were considered.  For Scenarios 3, 3a, 4, and 5, the African–American student projections appear under the heading of "racial balance." (Pls.' Ex. 8–10, 12.)

In addition, there are numerous charts introduced into evidence that provide African–American high school population projections, without providing similar projections for other racial and ethnic groups.  First, a chart dated August 26, 2008 that compared the pre–Proposed Plan 1 Scenarios being considered by the Administration, provided diversity data limited to the population estimates for African–American and socio–economically disadvantaged students.  (Pls.' Ex. 19, at 1719.)  Dr. McGinley handwrote on his copy of the chart the population projections for other racial and ethnic groups, as well as the number of specials needs students, that are provided under Scenario 3.  (Pls.' Ex. 19, at 1719.)  He also added a bracket next to the

22

numbers of African–American and socio–economic students for Scenario 4B with a notation reading "OK." (Pls.' Ex. 19, at 1719.) The next day, the chart was updated to include the full general diversity data under each Scenario.[11] (Pls.' Ex. 20.) Even though it was subsequently amended, the draft chart from August 26, 2008 provides another example of the Administration being provided African–American student projections to the exclusion of other types of racial data. Similarly, the only diversity data provided on a table comparing Scenarios 3, 3A, 4, and 4A is that of socio–economic and African–American projected enrollment. (Pls.' Ex. 26, at 3921.) Next, a chart comparing Scenarios 7C, 7C–1, and 8 does not mention race except for noting that Scenario 7C–1 "[r]educes the size of the A[frican–]A[merican] student community at [Harriton] from 88 to 58." (Pls.' Ex. 27, at 3931.)

The inclusion and consideration of African–American student data, to the exclusion of other types of diversity data (e.g. other races and ethnicities, socio–economics, or disability), reflect a specific concern about the African–American student population that started with Scenario 1 and continued throughout the redistricting process, even though subsequent Scenarios and Plans included broader diversity information. By including only African–American student data in the first five Scenarios considered during redistricting, the District, by way of Dr. Haber and the Administration, employed a "limited notion of diversity" similar to the plans criticized and ultimately held to be unconstitutional in Seattle. The Court will consider this issue further in

---

[11]As the Court will explain below, the collection, preparation, and inclusion of general diversity data is not objectionable, and the Court does not find the updated chart to be entitled to any weight, or indicative of "nefarious and underhanded conduct," as Plaintiffs contended at the oral argument following the bench trial. Accordingly, the Court also finds that subsequent documents comparing general diversity data for Scenarios 3 and 7C (Pls.' Exs. 23, at 3805–06, 24, at 0328–29), and for Scenarios 3, 4A, 7A, and 7B (Pls.' Ex. 149, at 2852–55), were routinely gathered, in part required by state law, and reflected information frequently and properly consulted by school officials and the community at large.

determining its legal conclusions.

### b. Elimination of Scenarios 1 and 4A

Dr. McGinley and Dr. Haber conceded in their testimony that Scenario 1 was "eliminated due to inequitable racial balancing," as Dr. Haber's handout respecting Scenario 1 expressly states. (Pls.' Ex. 6, at 3933 (emphasis removed).) At trial, Dr. McGinley testified that Ardmore has the "single largest concentration of African–Americans in the school district," and that he was "worried about removing all African–Americans from a high school." Scenario 1, however, was also eliminated for non–racial reasons: It would result in long travel times, and more importantly, it violated the cardinal redistricting principle of equalized high school populations, by projecting enrollment at Lower Merion High School that exceeded that high school's student capacity by 15 students, and exceeded the enrollment of Harriton by 150 students.

In developing Proposed Plan 1, the Administration narrowed down the choice to either Scenario 3, which redistricted North Ardmore for Harriton, and Scenario 4A, which is the only Scenario that the Administration ever considered that did not redistrict either North Ardmore or the Affected Area for Harriton. The Administration chose Scenario 3. A slide show presentation Dr. Haber subsequently prepared, includes in the reasons for not selecting Scenario 4A, the fact that it "[d]oes not support the community value of diversity as does other scenarios." (Pls.' Ex. 11, at 0164.) Although Dr. McGinley questioned the accuracy of Dr. Haber's presentation at trial, Board Member David Ebby also confirmed that Dr. McGinley stated that "[e]verything is very similar" between Scenarios 3 and 4A, but that Scenario 3 had "more racial diversity." Accordingly, two of the Scenarios, Scenarios 1 and 4A, were eliminated due to race.

When this finding is coupled with the fact that the Administration had been given and considered only African–American student projections for Scenarios 1 through 5, there is ample

evidence indicating that racial balance, and in particular, the number of African–Americans projected to enroll at each high school, were taken into account by the Administration in selecting Proposed Plan 1.

### c.     Awareness of <u>Seattle</u>

On August 13, 2008, Dr. McGinley emailed to himself a copy of a San Francisco Chronicle article entitled "Supreme Court:  Schools Can't Use Race to Assign Students," which briefly discussed the Supreme Court's decision in <u>Seattle</u>.  (Pls.' Ex. 54, at 2539.)  Dr. McGinley testified that somebody had told him that there was a case about the use of race in redistricting, and that he found the article in question after quickly searching the internet for the case.  Minutes after emailing himself the article, Dr. McGinley forwarded the article to Dr. Haber and asked, "How does our plan connect to this decision if we split Ardmore for high school?"  (Pls.' Ex. 54, at 2539.)  At trial, Dr. McGinley explained that he sent the article to Dr. Haber, the redistricting consultant, to see if Dr. Haber was familiar with the decision, and both Dr. McGinley and Dr. Haber understood "split[ting] Ardmore for high school" as referring to the option of splitting an area of the district with a high concentration of African–Americans for high school.

Dr. Haber responded by saying that although he is not a lawyer, his recollection was that in the state of New Jersey, "race is not an issue in formulating education decisions," and that he read the Supreme Court's decision as providing that "if someone brought suit that the decision for redistricting was made on the basis of race[,] the District would lose in court . . . if there were no other pressing needs to make the change."  (Pls.' Ex. 54, at 2539; <u>see also</u> Pls.' Ex. 56, at 2546.)  Dr. Haber then stated, "If you would like[,] I can create a 'color blind' scenario."  (Pls.' Ex. 54, at 2539.)  Dr. McGinley testified that because he did not feel that Dr. Haber was the best person to speak with about the case, and because he thereafter decided to ask the District's legal counsel

about the issue, he did not respond to Dr. Haber's email. Dr. Haber testified that he in fact created "color blind" scenarios, which he understood to be "one[s] that disregarded diversity as far as ethnicity is concerned," but does not recollect the Administration considering these scenarios.

Although Plaintiffs contended at oral argument, following the bench trial, that this series of emails demonstrated that the District had "knowledge of its improper conduct," the Court disagrees. The School District and Dr. McGinley cannot be criticized for researching and discussing a recent Supreme Court case concerning the use of race in redistricting. In doing so, Dr. McGinley exhibited a desire to be well–informed as to how to ensure that the redistricting process did not violate the law, and reflected a good faith effort to examine an issue that had been brought to Dr. McGinley's attention.[12] School administrators and districts should not be faulted for acquiring knowledge about guiding Supreme Court decisions, in order to understand the relevant constitutional limitations on decision–making. Nonetheless, the emails that followed demonstrate that Dr. McGinley was mindful that splitting Ardmore effectively redistricted a significant number of African–American students, and that the Seattle decision might have implications on the District's redistricting process. In addition, the emails show that Dr. Haber considered redistricting plans that split Ardmore to not be "color–blind," and that the Administration did not consider plans he viewed as being "color–blind," which support an inference that race was considered. In order to examine the extent to which Dr. Haber's views were shared by the School Administration and the School Board, the Court must look to other evidence respecting the redistricting process.

---

[12] As the undersigned stated during the trial, and will discuss in more detail in the forthcoming conclusions of law, understanding Seattle is challenging for judges and lawyers, let alone for a professional educator.

### 2. Proposed Plan 1

On September 8, 2008, Proposed Plan 1 was presented at a public Board meeting. Proposed Plan 1 determined what high school each student in the District must attend, based on where the student lived in the District. Plan 1 required no redistricting at the elementary school level, and allowed students to remain with their cohorts from kindergarten through to grade 8; however, the plan redistricted all of Penn Wynne, including North Ardmore, and areas of Penn Valley, excluding the Affected Area, for Harriton High School. (Pls.' Ex. 1, at 0033.)

Students districted to attend Lower Merion High School under Proposed Plan 1 retained the option to attend Harriton High School in order to enroll in its IB program. In addition, Proposed Plan 1 had a grandfathering component, meaning that all current high school students were given the option to remain at the high school they presently attended. (Pls.' Ex. 1, at 0049.) All students districted for Harriton, including North Ardmore, did not have the choice to attend either high school.

Under Proposed Plan 1, Harriton High School had a projected enrollment of 110 African–American students, 9.9 percent of the projected total Harriton student population of 1193, almost a 100% increase from the 46 African–American students that made up 5.7 percent of the total student population at Harriton prior to redistricting. (Pls.' Exs. 1, 140.) The percentage of African–American students at Harriton now mirrored the overall district–wide percentage of African–American high school students by approximating 10 percent.

### a. Likelihood of Randomized Student Assignment

At trial, Dr. Pavel Greenfield, an expert in applied mathematics with a background in statistics, testified on behalf of Plaintiffs. (Pls.' Ex. 196.) Dr. Greenfield conducted a statistical analysis of Proposed Plans 1, 2, and 3, and concluded that there was a close to zero percent chance

that Proposed Plans 1 and 3 involved the randomized assignment of individual students, and a twenty percent chance that Proposed Plan 2 involved randomized individualized assignment. (Pls.' Ex. 197.)  Although Dr. Greenfield is qualified as an expert and credible, the Court places little significance upon his conclusions, because Dr. Greenfield did not take into account the fact that none of the Proposed Plans involved the assignment of individual children, as opposed to assignments based primarily on geography.  Moreover, Dr. Greenfield conceded that he could not isolate race or any other factor as contributing to, or resulting in, the Proposed Plans that the Administration selected.

### b.      General Diversity Data

The slide show presentation accompanying Proposed Plan 1 included a slide providing general diversity numbers, that being the student breakdowns according to race and ethnicity, socio–economics, and disability.  There is nothing objectionable in the District's decision to include a general diversity slide in Proposed Plan 1's powerpoint presentation, especially when the community had expressed an interest in cultivating diversity, and diversity numbers can be of concern to educators in addressing the achievement gap.   In addition, the Supreme Court's decision in <u>Seattle</u> refrained from prohibiting educators from taking into account overall diversity, and Justice Kennedy's concurring opinion suggests that schools may remain cognizant of racial diversity, <u>id.</u> at 789, and that "[d]iversity, depending on its meaning and definition, is a compelling education goal a school district may pursue," <u>id.</u> at 783.

### c.      Redistricting Press Release

On September 8, 2008, the same day of the public presentation of Proposed Plan 1, Dr. McGinley emailed Director of Communications, Doug Young, a copy of a draft Press Release, which included the following statement:  "The plan also addresses community values related to