UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Student Doe 1 by and through his Parents/Guardians Does 1 and 2, et. al. | : : : : | |
| Plaintiffs | : : | Civil Action No. 09-2095 |
| V. | : : | |
| Lower Merion School District | : : | |
| Defendant | : | |

### PLAINTIFFS' POST TRIAL BRIEF

Plaintiffs, Students Doe, by and through their undersigned counsel, file the present Brief in accordance with this Honorable Court's Order dated May 13, 2010.

### Factual Background

Following a nine (9) day non-jury trial, this Honorable Court entered its Memorandum of Factual Findings, hereinafter referred to as "Factual Findings," on May 13, 2010. Of critical importance to this case is the Court's finding "that race was one of several factors motivating the School Administration, as it developed and recommended redistricting plans." Factual Findings at page 3. This Court also found that "the process of redistricting repeatedly embraced the goal of achieving racial parity between [Harriton High School and Lower Merion High School]." Id. As demonstrated in the paragraphs which follow, the aforementioned factual findings lead conclusively to a verdict in favor of Students Doe.

**Argument**

In its Factual Findings, the Court has requested briefing on seven (7) legal questions that relate to the Findings of Fact. Students Doe will provide the answers to the Court's questions within the framework of their four (4) part discussion which appears in the paragraphs that follow.

**1. Seattle School District is controlling in the present case.**

Students Doe have consistently taken the position throughout the present litigation that Seattle School District is controlling in the present case. As the most recent expression of the Supreme Court's reasoning on the issue of racially motivated school districting, the decision cannot be analytically ignored. Moreover, Seattle School District presents the exact same legal issue as this case despite the fact that it is somewhat factually different.

Although Students Doe concede that the Seattle and Louisville student assignment plans are different than Lower Merion's redistricting plan in that they individually assigned students to a given school, this is in fact a distinction that makes no legal difference. Now that it has been found that race was a factor in redistricting Students Doe, the present case presents the same legal issue addressed in Seattle School District, i.e. "whether a public school that had not operated legally segregated schools or has been found to be unitary may choose to classify students by race and rely upon that classification in making school assignments." Parents Involved in Community Schools v. Seattle School District No. 1, 551 U.S. 701, 711 (2007). It is hornbook law that cases presenting identical legal issues should be resolved in the same manner.

Besides involving the same legal issue, Lower Merion's redistricting plan, and the Seattle and Louisville student assignment plans also share several characteristics. It is clear that all three

(3) plans targeted African American student populations. The Lower Merion plan did so by redistricting a neighborhood with high concentrations of African American students. Seattle and Louisville chose to control African American populations in schools by limiting admissions and transfers. All of the plans also share the characteristic that they had very limited notions of diversity, i.e. African American versus everyone else.

Two additional points warrant some discussion in light of the Court's questions and the aforementioned analysis. The first point is that Lower Merion's redistricting plan, both in scope and operation, is more pernicious than the individual assignment plans struck down in Seattle School District.

According to the Court's Factual Findings, a total of forty four (44) freshman were redistricted for the 2009-2010 school year, the first year of the redistricting plan. Findings of Fact at page 50. Slightly less than one third (1/3) of this cohort were African American. Id. According to Dr. McGinley's January 12, 2009, e-mail to the Board of School Directors, forty five (45) African American children will be redistricted by the 2012-2013 school year, i.e. the first school year after grandfathering concludes. See P-123.

However, according to the Supreme Court's decision in Seattle School District, "the district could identify only 52 students who were ultimately affected adversely by the racial tiebreaker in that it resulted in assignment to a school they had not listed as a preference and to which they would not otherwise have been assigned." Seattle School District, 551 U.S. at 733-734. It has to kept in mind that Seattle operates ten (10) high schools, Id. at 711, while Lower Merion operates only two (2). On a percentage basis, Lower Merion's redistricting plan is much more far reaching than Seattle's student assignment plan.

3

Moreover, as noted in Students Doe's Summary Judgment Brief, conceivably there could be years that Seattle's student assignment plan would not have affected anyone at all because Seattle's high schools were not racially "oversubscribed." Lower Merion's redistricting plan will continue to violate the United States Constitution and Federal Law year after year until either this Court enjoins it, or the Lower Merion School Board decides to change it.

The second point is related to the Court's question concerning what legal significance stems from the fact that Lower Merion's redistricting plan had more impact on non-African American children in the affected community than on African American children in the affected area. This situation has no legal bearing on the present case for several reasons.

First, as the Supreme Court has repeatedly indicated, the Constitution of the United States protects individuals, not groups. Because the Constitution protects individual rights, even one child affected is one too many. Second, as Students Doe noted in their Summary Judgment Brief, Lower Merion does not get a "constitutional pass" because it only discriminates against just a few kids.

Third, as noted in the preceding paragraphs, when considered in light of the student assignment plan struck down in <u>Seattle School District</u>, Lower Merion's improper actions herein are incredibly worse. According to the numbers cited earlier, Lower Merion, while operating one fifth (1/5) the number of high schools will redistrict in African American students alone almost the same number of students that the entire Seattle individual assignment plan affected. If the Supreme Court deemed the Seattle individual assignment plan constitutionally offensive, than Lower Merion's redistricting plan can only deemed incredibly constitutionally offensive.

Finally, the situation presented demonstrates exactly why race based redistricting should only be used as a remedial last recourse when a school district has operated a segregated school system. In the present case, any number of non-African American students have been assigned to attend a non-neighborhood high school simply because they live in a neighborhood with one of the highest concentrations of African American students. The unfairness of this situation speaks for itself.

What is less obvious, but perhaps more concerning, is the impact Lower Merion's actions have on the progressive diversification of neighborhoods. Federal court judges, school officials, and diversity "experts," time and again in busing cases cite the adverse impact racial housing patterns have on the racial make-up of schools. However, if the affected area and neighborhoods like it throughout this country remain in the cross hairs of school administrators who use race based plans to diversify schools, neighborhoods will remain non-diverse as will the schools. What incentive is there for non-African American families with school aged children to move into the affected area if they are always subjected to educational disruptions due to the race of their neighbors? Ironically, by engaging in race based redistricting, Lower Merion has insured that race, in all likelihood, will be a factor in the next round of redistricting. It is time for the cycle to stop. In the words of Chief Justice Roberts, "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." Seattle School District, 551 U.S. at 748.

**2. Strict scrutiny is the proper standard for review.**

The Court noted in its Summary Judgment Opinion, that there are three (3) distinct standards under which challenges to governmental actions are considered, i.e. strict scrutiny, intermediate scrutiny, and the rational basis test. The most stringent of these standards is strict

scrutiny which, when applied, has proven almost fatal in fact in most cases. Seattle School District, 551 U.S. at 752 (The use of strict scrutiny to review government action "has proven automatically fatal in most cases." Id. (Thomas J.) (internal citations omitted)).

In order to satisfy the strict scrutiny standard, Lower Merion must demonstrate that the use of individual racial classifications is "narrowly tailored" to achieve a "compelling" government interest. Seattle School District, 551 U.S. at 720. In order to satisfy the intermediate scrutiny standard, the government policy at issue "must be substantially related to an important governmental objective." Student Doe v. Lower School District, 2010 U.S. Dist. Lexis 16357 page 7 (Slip op February 24, 2010) citing Clark v. Jeter, 486 U.S. 456, 461 (1988). Under the rational basis test, the least exacting of the standards, government policy will only be struck down if the government is deemed to have acted irrationally. Student Doe v. Lower School District, 2010 U.S. Dist. Lexis 16357 pages 7-8 citing Vance v. Bradley, 440 U.S. 93, 97 (1979).

The Court should apply strict scrutiny when resolving Students Doe's constitutional claim. The Court previously determined in its Summary Judgment Opinion that strict scrutiny should be applied if Students Doe could prove at trial that race was a factor in redistricting. Student Doe v. Lower School District, 2010 U.S. Dist. Lexis 16357 page 15 ("The Court, however, notes that the burden of showing that Defendant's plan violates the Equal Protection Clause, Section 1981, and Title VI, will remain at all times with Plaintiffs, unless they are able to show evidence of purposeful racial discrimination. Should Plaintiffs make such a showing, strict scrutiny will apply, and the burden will shift to Defendant to show that it had a compelling interest for redistricting as it did, and that its adoption of Plan 3R was narrowly tailored to such an interest." Id.). The Court's subsequent holding in its Findings of Fact that race was a factor in redistricting satisfied the only remaining condition for the application of strict scrutiny.

The Court's Summary Judgment Opinion is clearly correct under the controlling caselaw. See e.g. Seattle School District, 551 U.S. at 720 ("It is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." Id.); Johnson v. California, 543 U.S. 499, 506 (2005) ("we therefore apply strict scrutiny to all racial classifications to 'smoke out' illegitimate uses of race by assuring that [government] is pursuing a goal important enough to warrant use of a highly suspect tool." Id.); Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227 (1995)("Accordingly, we hold today that all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." Id.); Grutter v. Bollinger, 539 U.S. 306, 331 (2003) ("We are a free people whose institutions are founded on the doctrine of equality...It follows from that principle that government may treat people differently because of their race only for the most compelling reasons." Id. (internal citations omitted)); Gratz v. Bollinger, 539 U.S. 244, 270 (2003) ("It is by now well established that all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized." Id. (internal citations and quotations omitted)); Pryor v. National Collegiate Athletic Association, 288 F.3d 548, 566-567 (3d Cir. 2002).

Additionally, as noted numerous times in Students Doe's Briefs and other filings with the Court, it is irrelevant whether Lower Merion acted with good intention or bad intention when creating the redistricting plan at issue; the only thing relevant to the inquiry is whether Lower Merion was motivated by discriminatory purpose. See Seattle School District, 551 U.S. at 732 ("The principle that racial balancing is not permitted is one of substance, not semantics. Racial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'" Id.) ("Simply because the school districts may seek a

7

worthy goal does not mean they are free to discriminate on the basis of race to achieve it, or that their racial classifications should be subject to less exacting scrutiny." Id. at 743.); Pryor, 288 F.3d at 562.

As noted in the preceding paragraphs, it is Lower Merion's burden to establish that its conduct does not run afoul of the Fourteenth Amendment to the United States Constitution. When considering Lower Merion's conduct, it must also be kept in mind that all ambiguities in the policy at issue are to be construed against the school district. See Seattle School District, 551 U.S. at 786 (Kennedy J.).

Lower Merion's actions in this case cannot survive strict scrutiny for several reasons. First, Lower Merion has never articulated a compelling state interest in order to justify using race as a factor in redistricting. In fact, it is impossible for Lower Merion to argue this point at this late date. In its filings with the Court, and throughout trial, Lower Merion steadfastly maintained that it did not use race as a factor in redistricting. At no point during trial was any evidence ever introduced which set forth any type of goal or interest related to the use of race in redistricting.

Lower Merion's witnesses in fact testified that race based redistricting was not necessary to address achievement gap and/or racial isolation issues. Dr. McGinley, Dr. Claudia Lyles, and Dr. Robert Lee Jarvis, all unequivocally testified that strategies other than race based redistricting could be used to address racial isolation and/or the achievement gap. Interestingly, neither Dr. Lyles nor Dr. Jarvis participated in Lower Merion's redistricting effort. In fact, no credentialed diversity expert ever participated in Lower Merion's redistricting.

Second, even if it were legally permissible to infer a goal associated with Lower Merion's use of race as a factor in redistricting, the only goal which one can infer has already been

classified as "patently unconstitutional." The Court in its Findings of Fact found that Lower Merion used race as a factor in redistricting in order to achieve "racial parity" between Harriton High School and Lower Merion High School. Findings of Fact page 3. The Supreme Court has already concluded that redistricting plans adopted and subsequently implemented to achieve outright racial balance are patently unconstitutional. Seattle School District, 551 U.S. at 726; Grutter, 539 U.S. at 329-330.

Third, due to Lower Merion's failure to articulate any goal related to its use of race as a factor in redistricting, it now becomes impossible to determine whether Lower Merion's actions are narrowly tailored. There is no evidence in the trial record regarding how many African American students needed to be redistricted, and whether this number of students were in fact moved or scheduled to be moved in the future. There is also no evidence in the record regarding whether race neutral programs were seriously considered, whether targeted magnet programs were seriously considered, or whether other "choice" based programs were seriously considered. Predictably, there also is nothing in the trial record demonstrating that these programs could not work. The only evidence in the trial record is that Lower Merion has had some success in drawing children away from Lower Merion High School to Harriton High School.

There is also no evidence whatsoever in the trial record which would support the conclusion that once the African American student population at both high schools becomes equal there will be more African American children taking classes with their non-African American counterparts. Diversity, to have any value in education, requires that children from diverse backgrounds learn together, not just get off the bus, and then get back on the bus, at the same place at the same time.

Finally, even if Lower Merion identified a compelling state interest it sought to address, and even if Lower Merion could point to some evidence in the trial record that would establish narrow tailoring, its redistricting plan still violates the Fourteenth Amendment because it contains no limitations on its duration. All of the School Directors testified that the redistricting plan did not have a "sunset" provision, and that the plan would stay in place for the foreseeable future. However, to survive strict scrutiny, government actions that use race as a factor in their development must be limited in duration. See Grutter, 539 U.S. at 341-342.

In light of the foregoing situation, Lower Merion is sure to argue that a less exacting review of its redistricting plan is appropriate. It is certain that this argument will be premised on the fact that Seattle School District is a plurality opinion, and Justice Kennedy's concurrence contains several ambiguous statements regarding the proper level of scrutiny to be applied. This Court has already analyzed this argument at length in its Summary Judgment Opinion, and properly found that it unavailing. Student Doe v. Lower School District, 2010 U.S. Dist. Lexis 16357 pages 8-12.

In light of this Court's prior analysis and disposition of the issue, there are only four (4) additional comments Students Doe wish to make. First, although Lower Merion and some others tout the demise of strict scrutiny in cases like this, their position is clearly overstated. In order to apply any other standard of scrutiny to a case in which race was a factor in decision-making, the Court would, at a minimum, have to overturn or ignore Seattle School District, Johnson, Adarand, Grutter, Gratz, and Pryor.

Second, an informed reading of Seattle School District will reveal that all nine (9) justices agree that strict scrutiny should apply. Chief Justice Roberts clearly states in his plurality

10

opinion that strict scrutiny applies, and that the student assignment plans in question do not further a compelling state interest in a narrowly tailored manner. Justice Thomas comes to the same conclusion in his concurrence. In his concurrence, Justice Kennedy finds that strict scrutiny applies, but that in some instances the goal of diversity can be a compelling state interest. Justice Kennedy then goes on to find that the student assignment plans at issue do not meet the narrow tailoring prong of the strict scrutiny test.

After arguing at length as to why strict scrutiny should not apply in cases like the instant matter, Justice Breyer states in his dissent, "Nonetheless, in light of Grutter and other precedents, see, e.g., Bakke, supra, at 290...I shall adopt the first alternative. I shall apply the version of strict scrutiny that those cases embody. I shall consequently ask whether the school boards in Seattle and Louisville adopted these plans to serve 'compelling governmental interest' and, if so, whether the plans are 'narrowly tailored' to achieve that interest. If the plans survive this strict review, they would survive less exacting review a fortiori." Seattle School District, 551 U.S. at 837. Justice Breyer then found that Seattle and Louisville's student assignment plans survived strict scrutiny. Justice Stevens , Justice Ginsburg, and Justice Souter joined in Justice Breyer's dissent. The foregoing should foreclose any argument under Marks v. United States, 430 U.S. 188 (1977), that strict scrutiny does not apply in the present case.

Third, in light of Justice Kennedy's concurrence and Justice Breyer's dissent, the true Marks issue presented in this case is not whether strict scrutiny applies; instead, the issue is whether the goal of achieving diversity can constitute a compelling state interest. However, for the reasons previously discussed in the present Brief that issue does not have to be resolved in this case, and is better left to a day when the issue is squarely before the Court.

As noted above, there is no evidence in the record exactly what goal Lower Merion was seeking to achieve when it used race as a factor in redistricting. Furthermore, the only potential goal the Court identifies in its Findings of Fact, i.e. achieving racial balance between the two high schools, has already been found "patently unconstitutional." Seattle School District, 551 U.S. at 726; Grutter, 539 U.S. at 329-330. Furthermore, for any number of reasons cited previously, Lower Merion will never be able to meet the "narrowly tailored" prong of the strict scrutiny test.

Fourth, even if intermediate scrutiny, or the rational basis test were applied in this case, Lower Merion's redistricting plan would still have to be struck down. From a constitutional standpoint, the only discernable basis for Lower Merion's actions has already been found "patently unconstitutional." Id. Moreover, the narrow tailoring arguments set forth above would also apply in an intermediate scrutiny analysis.

Additionally, if intermediate scrutiny or the rational basis test are used to evaluate the constitutional aspects of Students Doe's claim, then there should be some consideration given to the Supreme Court's recent decision in Ricci v. DeStefano, 129 S. Ct. 2658 (2009). In Ricci, firemen in Connecticut filed suit under the Fourteenth Amendment to the United States Constitution, and Title VII of the Civil Rights Act, after the City of New Haven invalidated promotion test scores because minority candidates had not performed as well as their non-minority counterparts.

Instead of deciding the case on constitutional grounds, the Supreme Court decided to overturn New Haven's actions under Title VII. The Supreme Court stated, "Petitioners raise a statutory claim, under the disparate-treatment prohibition of Title VII, and a constitutional claim,

under the Equal Protection Clause of the Fourteenth Amendment. A decision for petitioners on their statutory claim would provide the relief sought, so we consider it first." Id. at 2672.

Applying this rationale in the instant case would result in a judgment for Students Doe. Students Doe have preserved in their filings with this Court their right to relief under 42 U.S.C. Section 1981, and Title VI of the Civil Rights Act, 42 U.S.C. Section 2000d et. seq. Students Doe's Complaint in this matter seeks relief under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. Section 1981, and Title VI of the Civil Rights Act, 42 U.S.C. Section 2000d et. seq.

The Court's finding that race was a factor in Lower Merion's redistricting demonstrates that Lower Merion violated 42 U.S.C. Section 1981 and Title VI. 42 U.S.C. Section 1981 provides in relevant part that "All persons within the jurisdiction of the United States shall have the right in every State and Territory ...to the full and equal benefit of all laws and proceedings..."Id. at Section 1981(a). Title VI states that "No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Id. at 2000d). Therefore, even if Lower Merion were to escape liability under a Fourteenth Amendment theory, its actions would still violate 42 U.S.C. Section 1981 and Title VI, and appropriate relief should be granted.

**3. The fact that the redistricting plan applies to everyone in the affected area has no legal consequence.**

Lower Merion has previously argued that because its actions apply to everyone in the affected area it has not violated the Fourteenth Amendment to the United States Constitution.

Why this argument may have some visceral appeal, it has legally been rejected by the Supreme Court. In <u>Williams v. Vermont,</u> 472 U.S. 14 (1985), the Supreme Court held, "A state cannot deflect an equal protection challenge by observing that in light of the statutory classification all those within the burdened class are similarly situated. The classification must reflect pre-existing differences; it cannot create new ones that are supported by only their own bootstraps." <u>Id.</u> at 27. <u>See</u> <u>also</u> <u>Rinaldi v. Yeager,</u> 384 U.S. 305 (1966) ("The Equal Protection Clause requires more of a state law than nondiscriminatory application within the class it establishes." <u>Id.</u> at 308.

### 4. The quality of the high schools has no legal consequence.

Like the argument just discussed, the argument that "both high schools are good" also has some visceral appeal. However, when one considers the controlling precedent in the area, it too is found unavailing. First, the argument as presented is a variant of the very argument raised in <u>Plessy v. Ferguson,</u> 163 U.S. 537 (1896), i.e. people could be separated by race so long as they had equal facilities. It subsequently took the American people more than fifty (50) years to realize that the concept and its related process of dividing society along racial lines is inherently wrong. The Supreme Court clearly stated in <u>Brown,</u> "Separate educational facilities are inherently unequal. Therefore, … plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment." <u>Brown v. Board of Education,</u> 347 U.S. 483, 495 (1954)

The jurisprudential concepts handed down in <u>Brown</u> are still vibrant today. In <u>Johnson v. California,</u> 543 U.S. 499, the Supreme Court reviewed an unwritten California prison policy of "double celling" prisoners by race whenever they entered the prison system, and whenever they

were transferred within the prison system. California argued in part that strict scrutiny should not apply in this situation because all prisoners are equally segregated. The Supreme Court responded, "The CDC's argument ignores our repeated command that racial classifications receive close scrutiny even when they may be said to burden or benefit the races equally...Indeed, we rejected the notion that separate can ever be equal--or 'neutral'--50 years ago in <u>Brown v. Board of Education,</u> 347 U.S. 483 (1954), and we refuse to resurrect it today." <u>Johnson v. California,</u> 543 U.S. at 506 (some citations and quotation marks omitted).

Second, from a factual standpoint, even though both high schools may be objectively good, they are still very different high schools for children in the affected area. The fact that Lower Merion High School is close enough to walk to makes its resources far easier to use. The fact that Harriton High School is miles away with limited after school transportation makes it a facility that looks great in concept, but not nearly as educationally attractive in reality.

### **Conclusion**

The theme that transcends this entire case is that Students Doe, like every other child in the Lower Merion School District, have the right to be assigned to a school fairly, and that right should not be diminished in any way by the color of his/her skin. For all the foregoing reasons, a verdict should be rendered in favor of Students Doe.

       Respectfully submitted,

       /S/ David G. C. Arnold
       _____
         David G. C. Arnold

       Pennsylvania Attorney Identification No. 49819

       Suite 106, 920 Matsonford Road
       West Conshohocken, Pennsylvania 19428
       (610) 397-0722

       Attorney for Plaintiffs

Dated: May 27, 2010