## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Student Doe 1 by and through his Parents/Guardians Does 1 and 2, et al.** | : | |
| | : | |
| | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| | : | **CIVIL ACTION NO. 09-2095** |
| **v.** | : | |
| | : | |
| | : | |
| **Lower Merion School District,** | : | |
| | : | |
| **Defendant.** | : | |

### DEFENDANT'S MEMORANDUM OF LAW ON PROPOSED CONCLUSIONS OF LAW

Judith E. Harris (PA I.D. No. 02358)
Christina Joy F. Grese (PA I.D. No. 200727)
Allison N. Suflas (PA I.D. No. 204448)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
215-963-5028/5085/5752

Kenneth A. Roos, Esquire
Megan E. Shafer, Esquire
WISLER PEARLSTINE, LLP
484 Norristown Road
Blue Bell, PA 19422
610-825-8400

Attorneys for Defendant

Dated: May 27, 2010

I.   **INTRODUCTION**

Defendant Lower Merion School District ("Defendant" or the "District") submits this Memorandum of Law in accordance with the Court's May 13, 2010 Order directing the Parties to provide briefing on specific legal issues now that the Court has issued its Factual Findings.

As a preliminary matter, the District believes that certain of this Court's Factual Findings ("FF or Findings") issued on May 13, 2010 (Dkt. # 114) do not accurately reflect the record evidence. While it understands that such Findings are not subject to reversal unless "clearly erroneous," the District respectfully urges the Court to reconsider them.[1] Nevertheless, the District makes its legal arguments on the basis of the Court's Findings.

Based on the Court's Findings, Plaintiffs cannot prevail under the law. First, and as explained in detail below, Plaintiffs have not met their burden of establishing the kind of intentional race discrimination violative of the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et seq., and/or 42 U.S.C. § 1981. While the Court has found that "race was one of several factors motivating the School Administration, as it developed and recommended redistricting plans," FF at p. 3, such racial considerations are entirely appropriate under Justice Kennedy's controlling Seattle concurrence, and do not require examination under strict scrutiny, as argued *infra*. Second, even if strict scrutiny applies (which it does not), the District has met its burden of demonstrating compelling government interests in racial parity and/or diversity for the purposes of reducing racial isolation and ameliorating the achievement gap, and Plan 3R is narrowly tailored to achieving those compelling interests, as it does not assign students on an individual basis to a particular high

---

[1]      A schedule of these Findings and record references is attached hereto as Exhibit A.

school based on their race, and instead districts all students residing within the Affected Area to Harriton High School ("HHS") – along with all other students who live outside the historic Lower Merion High School walk zone and attend Penn Valley, Belmont Hills, and Gladwyne Elementary Schools – to HHS, irrespective of race.

## II.   LEGAL ARGUMENT

### A.   *Seattle* Does Not Prohibit The Action At Issue

From the very beginning of this case Plaintiffs have likened their claims to those set forth in the landmark Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1 ("Seattle") decision. See 551 U.S. 701, 127 S. Ct. 2738 (2007). This Court, however, has, on more than one occasion, recognized that Seattle is factually inapposite to the matter at hand.[2] The school districts in Seattle relied upon an individual student's race in assigning that student to a particular school, so that the racial balance at the school fell within a predetermined range based on the racial composition of the school district as a whole, thereby denying students assignment to particular schools based solely on their race. In short, both the Seattle and Louisville school districts at issue in Seattle assigned students on an *individual* basis, whereas the District assigned students "based on geographic residential areas." See FF at p. 56. Moreover, unlike the student assignment plans at issue in Seattle, which explicitly used students' racial classifications in assigning them to schools, see 551 U.S. at 711-12, 716-17, neither Plan 3R nor its official guiding principles, the Non-Negotiables, mentions race or racial classifications. See Dkt. #53, Memorandum on Summary Judgment, at p. 15; FF at p. 16; Pls.' Ex. 4. Consequently, this Court certainly is not constrained by Seattle, but, as discussed below, it can be guided by it. Nevertheless, the question posed by the Court remains: does Seattle require this Court to

---

[2]   While there is no case law that provides this Court with a direct factual foundation for its ruling, as the set of facts and issues raised by this case are new and different, Seattle does provide direction as to what is prohibited and what is permissible.

invalidate the Redistricting Plan adopted by the Lower Merion School District Board of School

Directors ("Board") on January 12, 2009?  For the reasons set forth below, the District

respectfully submits that the answer to this question is "no."

           1.      ***Seattle*** **Does Not Proscribe Any And All Considerations Of Race And Must Be Read Narrowly**

Chief Justice Robert's opinion in <u>Seattle</u> garnered only a bare majority (himself and

Justices Scalia, Alito, Thomas, and Kennedy) for its description of the facts and its articulation of

the decision.  These five justices agreed **<u>only</u>** upon the following:

(1)      The *student assignment plans at issue* utilized *individual race classifications* and, therefore, were subject to strict scrutiny, meaning that the districts were required to show that the use of individual race classifications in their assignment plans was narrowly tailored to achieve a compelling government interest;

(2)      <u>Grutter</u> did not apply, as the interests asserted by the districts (*i.e.*, Seattle's interests in reducing racial concentration in schools and ensuring that racially concentrated housing patterns do not prevent nonwhite students from having access to the most desirable schools, and Louisville's interest in educating students "in a racially integrated environment") were distinct from the interest in diversity in higher education recognized by <u>Grutter</u>; and

(3)      The districts failed to show that the use of individual race classifications in their student assignment plans were narrowly tailored to achieve their asserted interests.

<u>See</u> 551 U.S. 701, Parts III-A and C.

Notably, the <u>Seattle</u> majority could have ruled more broadly but did not.  Indeed, while

the Court placed limits on when and how school districts can consider the race of individual

students, **<u>it did not rule out any and all consideration of race</u>**.  Significantly, the questions

presented in the Petition for Writ of Certiorari submitted by Parents Involved in Community

Schools, and which served as the bases upon which the Supreme Court granted certiorari, are

much broader than the issues ultimately decided by the Court:

(1)     How are the Equal Protection rights of public high school students affected by the jurisprudence of <u>Grutter v. Bollinger</u>, 539 U.S. 306 (2003), and <u>Gratz v. Bollinger</u>, 539 U.S. 244 (2003)?

(2)     Is racial diversity a compelling interest that can justify the use of race in selecting students for admission to public high schools?

(3)     May a school district that is not racially segregated and that normally permits a student to attend any high school of her choosing deny a child admission to her chosen school solely because of her race in an effort to achieve a desired racial balance in particular schools, or does such racial balancing violate the Equal Protection Clause of the Fourteenth Amendment?

<u>See</u> <u>Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1</u>, No. 05-908, 2006 WL 1579631 (U.S. Jan. 18, 2006).  Of these three questions, it is clear that the Court did not decide the second issue.  There was no agreement by five justices that the interests asserted by the districts were not compelling government interests.  At the time <u>Seattle</u> was decided, diversity as a compelling government interest had been recognized by the Court only in the higher education context.  <u>See</u> <u>Grutter</u>, 539 U.S. 306.  While the <u>Seattle</u> Court very easily could have stated definitively that diversity is not a compelling interest in the primary and/or secondary education context, **it did not do so**.  The only question presented in the Petition for Writ of Certiorari that was directly answered by the Court was a version of the third question presented, *i.e.*, whether a public school that was not racially segregated could choose to classify students by race and rely upon that classification in making pupil assignments.  <u>Seattle</u>, 551 U.S. at 711.  Significantly, that question is not raised here, as the District did not classify individual students by race, nor did it assign students on an individual basis to schools.

In sum, the majority holding set forth in <u>Seattle</u> must be read narrowly in light of the particular facts at issue.  Given its facts, <u>Seattle</u> is limited to instances where individual racial classifications are utilized to assign individual students to a particular school and does not extend to the redistricting plan at issue here.

2.    **Justice Kennedy's Opinion**

Chief Justice Roberts' opinion won the agreement of only a plurality for what were arguably the boldest and most far-reaching aspects of the ruling.  Justice Kennedy played a key role in this dynamic, signing on only to the above-referenced portions, and then writing his own opinion, concurring in part and concurring in the judgment, in which he took great issue with key components of what the plurality had said.

Specifically, Justice Kennedy did <u>not</u> agree with Part III-B of the plurality opinion, which discussed the districts' asserted interests, as distinct from the interest upheld in <u>Grutter</u>, to justify their race-based assignments.  He expressly disagreed with the plurality's failure to acknowledge that the districts had identified compelling interests.  According to Justice Kennedy, achieving a diverse student population and avoiding racial isolation are compelling interests that a school district, in its discretion and expertise, may pursue.  <u>Id.</u> at 783, 797-98.  **Indeed, a <u>majority</u> of the Justices – Justice Kennedy and the four dissenters, *i.e.*, Justices Breyer, Stevens, Ginsberg, and Souter – concluded that school districts can take steps to pursue diversity and/or avoid racial isolation in schools.**

Justice Kennedy parted with the plurality because he felt that it implied "an all-too-unyielding insistence that race cannot be a factor in instances when, in [his] view, race may be taken into account, and because it was too dismissive of the legitimate interest government has in ensuring all people have equal opportunity regardless of their race."  <u>Id</u>. at 787-88.   He recognized the following:

> In the administration of public schools by the state and local authorities, it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body, one aspect of which is its racial composition. If school authorities are concerned that the student-body compositions of certain schools interfere with the objective of offering an equal educational opportunity to all of their students, **they are free to devise race-conscious measures to**

**address the problem in a general way and without treating each student in different fashion solely on the basis of a systematic, individual typing by race**.

Id. at 788-89 (emphasis added) (internal citations omitted).

Such race-conscious measures include:

- strategic site selection of new schools;

- **drawing attendance zones with general recognition of the demographics of neighborhoods**;

- allocating resources for special programs; recruiting students and faculty in a targeted fashion; and

- **tracking enrollments**, performance, and other statistics **by race**.

Id. at 789 (emphasis added).

As Justice Kennedy noted, such race-conscious mechanisms "**do not lead to different treatment based on a classification that tells each student he or she is to be defined by race, so it is unlikely any of them would demand strict scrutiny to be found permissible**." Id. at 789 (emphasis added) (citing Bush v. Vera, 517 U.S. 952, 958 (1996) (plurality opinion) ("Strict scrutiny does not apply merely because redistricting is performed with consciousness of race …. Electoral district lines are 'facially race neutral' so a more searching inquiry is necessary before strict scrutiny can be found applicable in redistricting cases than in cases of 'classifications based explicitly on race.'" (quoting Adarand Construction, Inc. v. U.S., 515 U.S. 200, 213 (1995)).

Justice Kennedy further stated that executive and legislative branches, which for generations now have considered these types of policies and procedures, should be permitted to employ them with candor and with confidence that **a constitutional violation does not occur whenever a decisionmaker considers the impact a given approach might have on students of different races.** Id. at 789 (emphasis added).

Notably, Justice Kennedy did not categorically prohibit the use of racial classifications in student assignment.  He instead concluded that "individual racial classifications employed in this manner may be considered legitimate only if they are a last resort to achieve a compelling interest."  Id. at 790.  In conclusion, Justice Kennedy contended that **"[a] compelling interest exists in avoiding racial isolation**, an interest that a school district, in its discretion and expertise, may choose to pursue.  Likewise, **a district may consider it a compelling interest to achieve a diverse student population.  Race may be one component of that diversity**, but other demographic factors, plus special talents and needs, should also be considered."  Id. at 798 (emphasis added).

"What the government is not permitted to do," Justice Kennedy wrote, "absent a showing of necessity not made in Seattle, is to classify every student on the basis of race and to assign each of them to schools based on that classification, as crude measures of this sort threaten to reduce children to racial chits valued and traded according to one school's supply and another's demand."  Id at 798.  Justice Kennedy cautioned, however, that the Court's decision "should not prevent school districts from continuing the important work of bringing together students of different racial, ethnic, and economic backgrounds."  Id.

In short, it is clear from Seattle what school districts cannot do:  they cannot classify individual students on the basis of race and then assign them to a school solely on that classification.  However, and as recognized by Justice Kennedy, whose concurring Seattle opinion constitutes the law of the land, *see infra* section III.B, school districts can consider race in myriad other ways without running afoul of the Equal Protection Clause.

### B.    Justice Kennedy's Deciding Opinion Is Binding Under *Marks*

The Seattle decision must be read in the light of the principle set forth by the Supreme Court in Marks v. United States, 430 U.S. 188 (1977), giving great weight to a swing opinion

such as Justice Kennedy's.  As the Supreme Court held in <u>Marks</u>:

> When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.

430 U.S. at 193 (quoting <u>Gregg v. Georgia</u>, 428 U.S. 153, 169 n.15 (1976)).

In other words, under <u>Marks</u>, the controlling opinion in the absence of a majority opinion is the narrowest opinion in support of the judgment.  <u>See</u>, <u>e.g.</u>, <u>Panetti v. Quarterman</u>, 127 S. Ct. 2842, 2856 (2007) ("When there is no majority opinion, the narrower holding controls.") (citing <u>Marks</u>, 430 U.S. at 193)).  Under the <u>Marks</u> doctrine, Justice Kennedy's opinion is controlling, given that it represents the narrowest grounds upon which the plans at issue were invalidated, *i.e.*, that the use of individual race classifications in the student assignment plans at issue was not narrowly tailored to achieve the districts' stated interests (*i.e.*, Seattle's interests in reducing racial concentration in schools and ensuring that racially concentrated housing patterns do not prevent nonwhite students from having access to the most desirable schools, and Louisville's interest in educating students "in a racially integrated environment").

While it is not always clear which opinion is the narrowest, in <u>Seattle</u> it is evident that Justice Kennedy's opinion is the narrowest in support of the judgment of constitutional invalidity because he would allow more instances of race-conscious government action than would the plurality.  It is particularly significant that the <u>Seattle</u> plurality did not challenge Justice Kennedy's discussion concerning race-conscious measures that do not demand strict scrutiny, nor did it challenge his discussion regarding diversity and the avoidance of racial isolation as compelling government interests.

Lower courts considering the issue have recognized that the deciding opinion of Justice Kennedy is binding under the <u>Marks</u> framework.  <u>See</u>, <u>e.g.</u>, <u>Hart v. Cmty. Sch. Bd. of Brooklyn</u>,

536 F. Supp. 2d 274, 282 (E.D.N.Y. 2008) (applying the principle espoused in Marks to conclude that "[t]he deciding opinion of Justice Kennedy . . . in effect becomes the Court's ruling."). See also N.N. ex. rel. v. Madison Metro. Sch. Dist., No. 08-cv-581-BBC, 2009 WL 4067779, at *10 (W.D. Wis. Nov. 24, 2009) ("Because no single opinion in *Parents Involved* garnered a majority of the Court, Justice Kennedy's opinion is controlling, at least to the extent it represents 'the narrowest grounds' for invalidating the two plans."); United States v. Alamance-Burlington Bd. of Educ., 640 F. Supp. 2d 670, 682-84 (M.D. N.C. 2009) (invoking Marks and relying upon Justice Kennedy's opinion to conclude that school system under prior desegregation order, although now declared unitary, should remain committed to maintaining integrated school system and could continue to address such concerns even after the desegregation order was dissolved; that racial diversity and avoiding racial isolation are compelling government interests that the school system may pursue; and that school system was free in the future to devise race-conscious measures to address student-body compositions that interfere with objective of offering equal educational opportunity to all students without treating each student differently solely on the basis of a systematic, individual typing by race).

    **C.**    **The Court Should Not Apply Strict Scrutiny, As The Race-Conscious Measures Utilized By The District Do Not Demand Such Scrutiny, And Because The Dangers Strict Scrutiny Was Intended To Flesh Out Are Not Present Here**

As this Court has recognized, Plan 3R is facially neutral – it contains no racial classifications, nor does it reference race. Plan 3R is based on school feeder patterns and geographic location: (1) all students attending Gladwyne, Belmont Hills, and Penn Valley Elementary Schools are zoned to attend Welsh Valley Middle School and then Harriton High School (with those Penn Valley students living in the Lower Merion High School walk zone having the option to choose between Harriton High School and walking to Lower Merion High

School); (2) all students attending Penn Wynne, Cynwyd, and Merion Elementary Schools are zoned to attend Bala Cynwyd Middle School, and then Lower Merion High School; and (3) all students zoned to Lower Merion High School have the option to elect to attend Harriton High School.  These feeder patterns assign all students "irrespective of race or ethnicity."  FF at p. 38. Consequently, and as this Court has recognized, strict scrutiny does not automatically apply.

Nevertheless, this Court has found that racial considerations were one of several factors motivating the Administration as it developed and recommended redistricting plans (FF at p. 3), and, therefore, it must be determined whether such considerations mandate an application of strict scrutiny.  This Court has noted in its Findings that "[t]he Board and Administration remained cognizant of the effects that a given redistricting proposal would have on the African-American students living in North Ardmore and the Affected Area," the Administration relied upon this data in the development of various plans, the Administration allowed racial considerations to influence which neighborhoods would be assigned to attend HHS, and the "adoption of Plan 3R resulted from Lower Merion Township's existing demographics, rather than an express intent to discriminate."  FF at pp. 52-54.  In short, this Court has found that the District utilized a race-conscious measure akin to the drawing of attendance zones in recognition of the demographics of neighborhoods, which constitutes the very action endorsed by Justice Kennedy, and which **does not demand strict scrutiny** because it "do[es] not lead to different treatment based on a classification that tells each student he or she is to be defined by race."  551 U.S. at 789.[3]

---

[3]    Even prior to Seattle, separate opinions of individual Justices have suggested that strict scrutiny should not apply to every instance in which race is implicated.  See, e.g., Johnson v. California, 543 U.S. 499, 516 (2005) (Ginsburg, J., concurring) (citing cases); id. at 538-41 (Thomas, J., dissenting).  Indeed, it would be ironic that the very race-consciousness devoted to the core values of equality and integration set forth in Brown v. Board of Education and embedded within public policy, see, e.g., No Child Left Behind Act of 2001, 20 U.S.C. § 6301 et seq. (whose stated purpose is to "close the achievement gap," and which requires the disaggregation of student performance and enrollment data by race), is inherently suspect and deserving of strict scrutiny review.

Moreover, the dangers that strict scrutiny was intended to flesh out simply are not present here.  The purpose of the strict scrutiny standard of review is to ensure that race-based governmental actions are not "in fact motivated by illegitimate notions of racial inferiority or simple racial politics . . . illegitimate racial prejudice or stereotype," and that "to whatever racial group . . . citizens belong, [they are] . . . treated with equal dignity and respect" in public decisionmaking.  City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493 (1989).  These dangers do not exist here, where the Court has "reject[ed] any allegations of invidious discrimination or hostility towards African-American students by the Administration or the Board," and where any consideration of race was related to sound educational policies, "including the reduction of the achievement gap, and the desire to reduce or eliminate racial isolation."  FF at p. 53.

As Justice O'Connor stated in Grutter, "[c]ontext matters when reviewing race-based governmental action under the Equal Protection Clause."  539 U.S. at 327.  A close examination of the issues raised by this case reveals that they are entirely different from the traditional affirmative action cases in which the Supreme Court has applied strict scrutiny.  For example, in affirmative action cases, the defendant, in the distribution of a limited good or benefit, such as admission to a selective college or university, a government contract, or public employment, gives preference to some persons on the basis of race.  See, e.g., Adarand, 515 U.S. at 211 (government contracts); Regents of the University of California v. Bakke, 438 U.S. 265 (1978) (medical school admissions); Gratz v. Bollinger (college admissions); Grutter v. Bollinger (law school admissions); United States v. Paradise, 480 U.S. 149, 153 (1987) (public employment).  In short, the Supreme Court has used strict scrutiny where it perceived a "racial preference" is at issue in evaluating applicants' relative merit or qualifications.  The NAACP Legal Defense &

Educational Fund has articulated the distinction between such cases and the K-12 public

education context as follows:

> [I]n the context of K-12 public education one begins with the proposition that
> students are not entitled to attend any particular school. *PICS*, 426 F.3d at 1181
> n.21; *McFarland*, 330 F. Supp. 2d at 860.  So long as school districts do not
> segregate students by race, *see Brown*, 347 U.S. at 493, the determination of
> where and how to assign students traditionally has been one for the political
> process and school authorities to resolve.  *See, e.g.*, *Johnson*, 604 F.2d at 515
> (citing cases).  Indeed, in the vast majority of school districts across the nation, no
> choice whatsoever is offered to students; they are simply assigned to a school
> based on whatever pedagogical or practical reasons the district might have for
> making those assignments.
>
> Unlike in the affirmative action context, public primary and secondary education
> is *not* a limited good: by law, all youth of specified ages must attend school, and
> those who choose to enroll in a public system will be and are assigned to a school
> in that system.  *PICS*, 426 F.3d at 1181; *McFarland*, 330 F. Supp. 2d at 859.  In
> both of the districts in question, the schools are resourced, staffed, and funded
> through the same means, and students are taught the same core curriculum.
> Denial of a substantially equal K-12 education is never an issue, *cf., e.g.*, *Gratz*,
> 539 U.S. at 251, and petitioners do not contend that it is here.

See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, Nos. 05-908, 05-915, 2006 WL

2927075, at *20-21 (U.S. Oct. 10, 2006), Brief of the NAACP Legal Defense & Educational

Fund, Inc. as Amicus Curiae In Support of Respondents.[4]

Concerns regarding the permissibility of perceived preferences or favoritism that exist in

the selective, competitive processes at issue in Gratz, Grutter, and Bakke are not present here,

where assignment to a particular high school is not based on a determination of merit or

qualifications.  See Gratz, 539 U.S. at 270-72; Grutter, 539 U.S. at 315 (noting that law school's

admission policy selects from qualified candidates based on numerous indicia of ability).  For the

same reasons, the dangers of stigmatic harm described in Bakke are not implicated.  See Bakke,

---

[4]   The Plaintiffs have argued that Brown v. Board of Education, 347 U.S. 483 (1954), precludes the District's
actions at issue in this case.  Significantly, the NAACP Legal Defense and Educational Fund, which served as
counsel for plaintiffs in Brown, takes an entirely different view.

438 U.S. at 298 (describing the risk of stigmatic harm that can be caused if affirmative action plans send the signal that minorities cannot succeed without "special protection").

Failure to be assigned to a particular high school is not equivalent to denial of admission to the elite law school, medical, and undergraduate institutions in <u>Grutter</u>, <u>Bakke</u>, or <u>Gratz</u>, and which raised red flags for the Court.  <u>See</u> <u>Bakke</u>, 438 U.S. at 301 n.39 (describing medical school admissions and public K-12 assignments as "wholly dissimilar").  Here, the District assigned entire geographic areas/feeder patterns to two public high schools that are alike in all material aspects.  As this Court itself has noted, both Lower Merion High School and Harriton High School are excellent schools, ranked among the best in the state if not in the nation (FF at p. 6), and neither is inferior to the other – indeed, choosing between Lower Merion High School and Harriton High School is like choosing between a Bentley and a Rolls-Royce, when everyone else is driving Toyotas and Chevrolets.  <u>See</u> Dkt. #101, Audio File of April 16, 2010 Afternoon Session, at 2:01:17-2:01:38.  While the District recognizes that parents and students may prefer to attend one particular high school over another, they have no constitutional right to do so.  <u>See</u>, <u>e.g.</u>, <u>Comfort v. Lynn Sch. Comm.</u>, 283 F. Supp. 2d 328, 364-66 (D. Mass. 2003), <u>aff'd on other grounds</u>, 418 F.3d 1 (1st Cir. 2004), <u>cert. denied</u>, 126 S. Ct. 798 (2005).

In sum, the typical Equal Protection concerns regarding the "distribution of burdens and benefits" that trigger strict scrutiny are not present here.  These distinctions further warrant the application of a less rigorous standard of review than strict scrutiny.

**D.      Rational Basis or Intermediate Scrutiny Is The Appropriate Standard Of Review**

"[T]he 'general rule' is that state legislation or other official action 'is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.'"  <u>Barnes Found. v. Twp. of Lower Merion</u>, 982 F. Supp. 970, 983 (E.D.

Pa. 1997) (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985)) (citing

F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993) ("In areas of social or economic

policy, a statutory classification that neither proceeds along suspect lines nor infringes

fundamental constitutional rights must be upheld against equal protection challenge if any

reasonably conceivable state of facts that could provide a rational basis for the classification.")).

Thus, "[w]hen official action taken pursuant to a facially neutral law is challenged under the

Equal Protection Clause, rational basis scrutiny will apply unless the plaintiff can show that the

law was enacted as a proxy for race or was applied on the basis of race, which would then trigger

strict scrutiny." Barnes, 982 F. Supp. at 983.  In order to make this showing, the plaintiff must

demonstrate that the defendant acted with the purpose or intent to discriminate on the basis of

race. Id.  See also Washington v. Davis, 426 U.S. 229, 239-42 (1976); Village of Arlington

Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977); Personnel Adm'r v. Feeney, 442

U.S. 256, 272 (1979).  The rational basis test is appropriate here, as Plan 3R is facially neutral,

and this Court already has rejected any allegations of invidious discrimination or hostility

towards African–American students by the Administration or the Board.

     The District can easily satisfy the rational basis test, as its Redistricting Plan clearly is

rationally related to a legitimate state interest. See, e.g., Lavia v. Pennsylvania Dept. of

Corrections, 224 F.3d 190, 199 (3d Cir. 2000) ("Under rational basis scrutiny, state action will

survive as long as it merely furthers a legitimate state interest.").  Indeed, Plaintiffs do not

dispute that it is well within a local school board's purview and discretion to promulgate and

implement redistricting directives to serve the educational interests of the district, nor do they

dispute that the Board had a legitimate interest in redistricting the District's high school students

so as to achieve equalized student enrollments at its two new high schools.  Plan 3R was

rationally related to that interest, as it fulfilled the objective of equalizing student enrollments in accordance with the Board's Non-Negotiables.  Consequently, the Redistricting Plan withstands rational basis review and is constitutional.

Nevertheless, courts routinely have used a different level of scrutiny, namely "intermediate scrutiny," for policies that are race-conscious but do not classify, *i.e.,* prefer, members of one race over another.  See, e.g., Jacobson v. Cincinnati Bd. of Education, 961 F.2d 100, 102 (6th Cir. 1992); Kromnick v. School Dist., 739 F.2d 894, 902-03 (3d Cir. 1984).  Assuming, *arguendo*, that this Court's determination that "considerations of race" played a role in the redistricting process mandates an intermediate level of scrutiny, the District can withstand such review.  The intermediate scrutiny standard of review requires the government to show that the policy at issue serves "important government objectives" to which the means chosen are "substantially related."  United States v. Virginia, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (citations omitted).  As this Court has recognized, the Board and Administration followed sound education policies, including the reduction of the achievement gap, and the desire to reduce or eliminate racial isolation (FF at p. 53), and to the extent that considerations of race played a role in the redistricting process, they did so in service of these valid educational objectives.

### E.      Even If The Court Applies Strict Scrutiny, Plan 3R Withstands Such Review

Even if this Court were to determine that strict scrutiny is the appropriate standard of review (which it is not), Plan 3R withstands such scrutiny.  As previously stated, it is significant that while it had the opportunity to do so, the Seattle plurality refused to hold that the interests asserted by the Seattle and Louisville districts were not "compelling."  To the extent that this Court has any doubts as to whether such interests are compelling, the District respectfully submits that it should look to Justice Kennedy and the four Seattle dissenters for guidance.

These individuals constitute a majority of Justices expressly finding that diversity and avoiding racial isolation are compelling government interests that school districts may pursue.

This Court has found that while the Board did not consider race in adopting Plan 3R, the process of redistricting embraced the goals of achieving some level of "racial parity" between LMHS and HHS and having "racial diversity" in both high schools.  FF at p. 3, 53.  This Court also has found that the Board and Administration followed sound educational policies, including the reduction of the achievement gap, and the desire to reduce or eliminate racial isolation.  FF at p. 53.  In accordance with Justice Kennedy's opinion and the opinions of the four <u>Seattle</u> dissenters, such interests are compelling.

These compelling interests are not negated by the Court's concern regarding references to African-American-specific data for many of the early Scenarios.  Indeed, it is only logical for the District to have focused specifically on African-American student data at times during the redistricting process, because – with the one exception of the small concentrated group of Asian-American students residing within the Shortridge neighborhood who alleged that they were disparately impacted by Proposed Plan 2 – African-American students were more concentrated geographically than students of other races.  <u>See</u> Dkt. #93, Audio File of April 12, 2010 Morning Session, Haber Testimony, at 1:56:08-1:57:17.   In addition, apart from White students, African-American students make up the most numerically significant racial group of students in the District (<u>see</u> Pls.' Ex. 140), and in terms of addressing the well-documented (and much testified to) achievement gap between African-American students and students of other races, such a focus is both logical and necessary.

Perhaps ironically, Plan 3R is narrowly tailored to achieving the aforementioned compelling interests from the very fact that it is broad in scope.  In other words, in adopting Plan

3R the District did not assign individual students to high schools; rather, it followed a plan for the entire District that involved moving geographically-based groups of students, some of whom happened to reside in a racially concentrated neighborhood, to a particular high school, along with students of other races. Indeed, and as the Court has observed, the denial of high school choice applies to all students in the Affected Area, including many White, Asian-American, and Hispanic-American students, and more students who are not African-American were affected by Plan 3R. FF at pp. 53-54.

In other words, Plan 3R did not target individual African-American students for assignment to HHS.[5] Rather, by virtue of geography and the District's pre-existing elementary and middle school feeder patterns, and in accordance with the overarching objective of equal student enrollments between the high schools, certain students are districted to HHS without the option of attending LMHS, and certain students are districted to LMHS with the option of attending HHS. While students who happen to be African-American and who formerly had choice are now districted to HHS, they are districted to HHS with other students – of all races – who previously had choice, as well as with students of all races who were districted to HHS without choice even prior to Plan 3R. Moreover, all students who are districted to LMHS, including North Ardmore, which has a significant African-American student population, have the option to attend HHS, regardless of race. Clearly, the District is treating all students who are

---

[5]  In its Findings the Court noted that under Proposed Plans 1, 2, and 3, the percentage of African-American students at HHS significantly increased or "nearly mirrored" the percentage of African-American students attending public high school in the District. FF at pp. 27, 33, 40. The District, however, to achieve equal student enrollments at LMHS and HHS in accordance with the CAC's recommendations, had to reduce the 700-student disparity between LMHS and HHS, which required it to increase the number of students at HHS by approximately 50 percent. Consequently, it is not surprising that the number of African-American students at HHS would increase as well, particularly when one takes into account the geographic location of various student populations. In sum, no significant conclusions can be drawn from the mere fact that the number of African-American students at HHS increased, because students were assigned based on geographic residential areas and not on an individual basis. FF at p. 53.

similarly situated geographically and in terms of elementary and middle school feeder patterns in the same manner.

Going forward under Plan 3R, every student who attends Penn Valley, Belmont Hills, and Gladwyne Elementary Schools, with the sole exception of those Penn Valley and Belmont Hills students residing within the historic LMHS walk zone, will attend Welsh Valley Middle School, as they did before, and then HHS.  This is distinct from the student assignment plans at issue in <u>Seattle</u>, which required an examination of individual students' races, each and every time they listed their school preference.[6]

Indeed, the primary reasons why Justice Kennedy agreed with the <u>Seattle</u> plurality that the Seattle and Louisville student assignment plans were not narrowly tailored to achieve their stated goals was because the school districts did not provide sufficient evidence to support the need for "individual racial classifications" to avoid racial isolation in schools, and because the districts "could have achieved their stated ends through different means" that did not depend on express racial classifications of individual students.  <u>Id.</u> at 2793.  That same concern is not present here, as the District has not utilized individual racial classifications in making determinations as to where students will attend high school.

## III.   <u>CONCLUSION</u>

While "considerations of race" may have been a motivating factor in the Administration's development and recommendation of proposed redistricting plans, such considerations are appropriate under <u>Seattle</u>, as well as the Supreme Court's other precedents.  Moreover, even if

---

[6]     Plaintiffs have argued and are likely to continue to argue that because the District has not identified a "threshold number" of African-American students necessary to alleviate racial isolation, Plan 3R is not narrowly tailored.  This argument should be rejected, as there is no formulaic solution to racial isolation and the related achievement gap.  Indeed, as Dr. McGinley, Dr. Lyles, and Dr. Jarvis testified, racial isolation is not triggered by or combated with a specific threshold number of students of a particular background in a given classroom or school.

the Administration's recommendation that the Board adopt Plan 3R was influenced by a desire

on behalf of the Administration for diversity in HHS and LMHS, the fact remains that the Board

adopted Plan 3R for reasons unrelated to race.  This Court has found that "[t]he Board Members

who voted to approve Plan 3R were not aware that racial considerations had played such a

significant role within the Administration."  FF. at p. 3.  It is therefore inconceivable that the

District could be held liable for race discrimination when the actual decisionmakers, *i.e.*, the

Board, made the decision to adopt Plan 3R without regard to race.  Nevertheless, even if the

Board Members had known of and made their decision to adopt Plan 3R based on the "racial

considerations" this Court believes influenced the Administration, such conduct still would be

constitutionally permissible under Justice Kennedy's analysis in Seattle.  For these and the

foregoing reasons, Plaintiffs' claims of race discrimination are legally insufficient, and the Court

should grant judgment in Defendant's favor.


          Respectfully submitted,

          */s/ Judith E. Harris*
          Judith E. Harris (PA I.D. No. 02358)
          Christina Joy F. Grese (PA I.D. No. 200727)
          Allison N. Suflas (PA I.D. No. 204448)
          Morgan, Lewis & Bockius LLP
          1701 Market Street
          Philadelphia, PA 19103
          215-963-5028/5085/5752

          Kenneth A. Roos, Esquire
          Megan E. Shafer
          WISLER PEARLSTINE, LLP
          484 Norristown Road
          Blue Bell, PA 19422
          610-825-8400

Dated:  May 27, 2010          Attorneys for Defendant
          Lower Merion School District

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of May 2010, copies of the foregoing Defendant's

Memorandum of Law on Proposed Conclusions of Law were electronically filed with the Clerk

of the Court using the CM/ECF system, which will send such notification to the following:

David G. C. Arnold, Esquire
Suite 106
920 Matsonford Road
West Conshohocken, Pennsylvania 19428
(484) 562-0008
DAVIDGCARNOLD@AOL.COM
**Attorney for Plaintiffs**


*/s/ Christina Joy F. Grese*
Christina Joy F. Grese