## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STUDENT DOE 1, et al., | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| LOWER MERION SCHOOL DISTRICT | : | NO. 09-2095 |

## MEMORANDUM ON CONCLUSIONS OF LAW

**Baylson, J.**                                                                                  **June 24, 2010**

### I.      Introduction and Summary

Plaintiffs Students Doe 1 through 9 ("Students") are African–American students who live

in Lower Merion School District ("District"), which is a government subdivision of a township

located in Montgomery County, Pennsylvania.  The Students, by and through Parents/Guardians

Doe 1 through 10 (collectively with Students, "Plaintiffs"), allege that the District discriminated

against them based on their race, by adopting a redistricting plan in January 2009, Plan 3R, that

took away their ability to choose to attend either of the District's high schools, Harriton and

Lower Merion, and required them to attend Harriton High School.  In particular, Plaintiffs allege

that the District violated the Equal Protection Clause of the Fourteenth Amendment (Count I), 42

U.S.C. § 1981 (Count II), and Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et seq. (Count

III), all pursuant to 42 U.S.C. § 1983, by discriminating against the Students based on their race.

Plaintiffs live in what has been referred to throughout trial as the "Affected Area," a

neighborhood that undisputedly contains one of the highest concentrations of African–American

students in the District.[1]

---

[1]The Court's February 24, 2010 Memorandum denying the District's Motion for
Summary Judgment, and May 13, 2010 Memorandum setting forth the factual findings,

On May 13, 2010, following a nine–day bench trial (Docket Nos. 89–94, 97–104),[2] the

Court made detailed findings of fact.  Doe v. Lower Merion Sch. Dist., No. 09-2095, 2010 WL

1956585 (E.D. Pa. May 13, 2010) ("Doe II").  Subsequently, the parties submitted further

briefing on the legal issues stemming from the findings of fact (Docket Nos. 117–118), and on

June 9, 2010, the Court held a hearing respecting such briefing (Docket No. 119).  Following the

hearing, Plaintiffs submitted supplemental briefing.  (Docket No. 120.)  For the reasons that

follow, the Court has concluded that the District did not violate the Equal Protection Clause, 42

U.S.C. § 1981, or Title VI of the Civil Rights Act, and thus, that judgment should be entered in

favor of the District.

---

summarized the relevant factual and procedural background, and explained the boundaries of the
Affected Area.  See Doe v. Lower Merion Sch. Dist., 2010 WL 1956585, at *2–3 (E.D. Pa. May
13, 2010) (factual findings memorandum) ("Doe II"); Doe v. Lower Merion Sch. Dist., 689 F.
Supp. 2d 742, 743–46 (E.D. Pa. 2010) ("Doe I") (summary judgment memorandum).

[2]To their credit, the parties have exclusively relied on digital audio recordings of court
proceedings that have been electronically uploaded to this Court's CM–ECF filing system, in
reviewing and citing the evidence introduced at trial, and arguments presented in hearings.  No
written transcript exists, resulting in substantial savings in cost and a significant reduction in
paper usage.  This Court participated in the Digital Audio File Electronic Access Pilot Program.
See Michael Kunz, Clerk of Court, U.S. Dist. Ct. for the E.D. Pa, Digital Audio File Electronic
Access Pilot Program Notice, http://www.paed.uscourts.gov/documents/handbook/notices/
app_bb.pdf (last visited June 23, 2010) (summarizing the program).  Earlier this year, after
finding this pilot program to be successful, the Judicial Conference of the United States allowed
all district courts, "at the discretion of the presiding judge, to make digital audio recordings of
court hearings available online to the public."  U.S. Courts, Judiciary Approves PACER
Innovations to Enhance Public Access, Mar. 16, 2010, http://www.uscourts.gov/News/News
View/10-03-16/Judiciary_Approves_PACER_Innovations_To_Enhance_Public_Access.aspx
(last visited June 23, 2010).
    However, assuming this Court's judgment is appealed, the Federal Rules of Appellate
Procedure currently have no provision permitting the use of digital audio files in an appeal in
which one of the parties raises an issue as to the relevance of particular evidence introduced, or
arguments made, in the district court.  In such a situation, Federal Rule of Appellate Procedure
10 requires a written transcript.  This Court respectfully suggests that the Advisory Committee on
Appellate Rules consider the benefits of digital audio files.

The task of running a populous township's school system composed of two high schools, two middle schools, and six elementary schools, is not one in which a federal district judge should interfere unless there is an overriding constitutional issue. Nevertheless, discrimination against any individual because of race or any other protected classification is illegal, and a judge has a high responsibility to act once proof of discrimination has been presented. This case requires the Court to balance these competing interests in deciding whether the redistricting of a geographic area due to its racial makeup violates the Equal Protection Clause and requires judicial action contrary to the school district's assignment plan.

Although Congress and the Supreme Court have unequivocally prohibited public officials from discriminating on the basis of individual racial classifications in distributing benefits or burdens, neither has determined that adverse impact alone is unconstitutional. This principle must be evaluated in the context of this Court's factual findings, particularly that the District did not invidiously discriminate against any individual student because of his or her race, but instead "targeted" the Plaintiffs' neighborhood for redistricting to Harriton High School, in part because that community has one of the highest concentrations of African–American students in the District.

Neither the parties' briefs nor this Court's substantial research disclose another school redistricting case in which such neighborhood "targeting" played a role in school assignments, and a court adjudicated the constitutionality of the overall redistricting scheme in light of such "targeting." In this sense, the current case is novel.

In a democracy, choices are necessarily limited, but the nature of the freedom in question affects the validity of a restriction on choice. For example, because we give paramount

protection to freedom of speech, freedom of press, and freedom of religion under the First Amendment, courts will not generally tolerate denials of an individual's choice of what to say or print, or whether or how to pray. The same is not true of a student's choice of high school, which is not a fundamental right, but is protected by the Equal Protection Clause, which does not permit school districts to burden students by depriving them of such choice on the basis of impermissible classifications. However, common sense teaches that school assignments are and should be related to where students live, because proximity between home and school has many positive social and educational benefits.

A court must protect a member of a minority group from the denial of a right guaranteed by the Constitution. Our recent constitutional history clearly demonstrates that racial discrimination is not tolerated. Some Supreme Court decisions that have dealt with allegations of discrimination in the educational context have applied "strict scrutiny" to review decisions in which racial considerations have played a role, thereby requiring a school district to show that redistricting is "narrowly tailored" to "compelling" state interests. Other Supreme Court cases not involving any individual racial discrimination, however, have applied less exacting levels of scrutiny.

A basic principle underlying this case is that pure "racial balancing" at the high school level, standing alone, would be improper, but that considering racial demographics alongside numerous race–neutral, valid educational interests—similar to the goal of achieving general diversity in higher education admissions programs, with reference to multiple factors such as race, gender, economic background, religion, and other individual characteristics—has never been held unconstitutional.

If strict scrutiny applies to this case, the Court must determine whether the inclusion of a particular geographic area due to its racial makeup violates the Equal Protection Clause, or whether the District has shown that the same redistricting plan would have been adopted absent such a concentration of African–American students. This is not a case in which a particular student has been provided a lesser education than his or her peers due to race, nor does the case involve the busing of students as a necessary measure to remedy previously segregated schools, or the denial of access to a particular educational program, course of study, or other educational resource. Rather, the question presented by this case is whether the Students have been burdened in a manner that offends the Equal Protection Clause by being deprived of their choice to attend a particular high school, because they live in a neighborhood assigned to Harriton High School due to its high concentration of African–American students, when the evidence shows that both high schools are excellent and offer outstanding opportunities,[3] and that all students in Plaintiffs' neighborhood, a majority of whom are not African–American, are similarly burdened.

Applying strict scrutiny to these facts, the Court concludes that the District has satisfied its burden of showing that Plan 3R was narrowly tailored to meet numerous race–neutral compelling interests—namely, having two equally sized high schools, minimizing travel time and costs, maintaining educational continuity, and fostering students' ability to walk to school. The District's mere consideration of the racial demographics of Plaintiffs' neighborhood does not

---

[3]At trial, the Court observed that, in light of the outstanding nature of both high schools in the District, forcing students to attend one school versus the other resembles forcing one to drive a Rolls Royce or a Bentley, when most people are driving Chevrolets or Toyotas. Of course, if the District discriminated on the basis of individual racial classifications in taking away Plaintiffs' choice of high school, and could not show that redistricting was narrowly tailored to compelling state interests, the adoption of Plan 3R would nonetheless violate the Equal Protection Clause.

warrant an opposite conclusion under existing Supreme Court or Third Circuit precedent.  Thus,

Plaintiffs are not entitled to relief.

II.    **Discussion**

    A.    **Appropriate Level of Scrutiny**

Before determining whether the District's actions comport with the Equal Protection

Clause, the Court must first determine the appropriate level of scrutiny for evaluating the

constitutionality of the District's adoption of Plan 3R.  As this Court has previously explained,

the differences between the levels of scrutiny—strict scrutiny, intermediate scrutiny, and rational

basis review—are not merely rhetorical.  See Doe v. Lower Merion Sch. Dist., 689 F. Supp. 2d.

742, 747–48 (E.D. Pa. 2010) ("Doe I") (explaining the standards under, and the effects of, each

level of scrutiny).  In many cases, whether a given governmental action is found to be

constitutional will hinge upon the operative level of scrutiny.  That said, in cases applying strict

scrutiny to educational policies involving race, the Supreme Court has repeatedly clarified that

"'[s]trict scrutiny is not strict in theory, but fatal in fact.  Although all governmental uses of race

are subject to strict scrutiny, not all are invalidated by it.'"  Parents Involved in Community

Schools v. Seattle School District No. 1, 551 U.S. 701, 833 (2007) ("Seattle") (quoting Grutter v.

Bollinger, 539 U.S. 306 (2003) (internal quotation marks and alterations omitted)).

    1.    **Supreme Court Cases Applying Strict Scrutiny**

Turning first to the most stringent of the levels of scrutiny, strict scrutiny, Plaintiffs have

asserted that Supreme Court precedent requires such searching scrutiny in the present case.  As

explained below, the Supreme Court cases relied upon by Plaintiffs are distinguishable,

indicating that strict scrutiny may not be the operative standard to evaluate the constitutionality

of the District's January 2009 redistricting.

### a. Seattle

Throughout this case, the parties have vigorously disputed whether this case is governed by <u>Seattle</u>, in which the Supreme Court concluded that school districts in Seattle and Louisville violated the Equal Protection Clause by using a student's race to determine what high school he or she would attend.[4]  <u>Seattle</u> sheds significant light on what level of scrutiny the District must withstand, because it is the only Supreme Court case involving high school student placement that Plaintiffs have cited in support of their position that strict scrutiny applies, and the only recent Supreme Court case respecting the use of race in placing high school students.

The parties agree that in contrast to the student assignment plans at issue in <u>Seattle</u>, which assigned students to high schools based on individual racial classifications, the District assigned students to either Harriton High School or Lower Merion High School by neighborhood.  (Pls.' Supp. Post–Trial Br. 2, Def.'s Post–Trial Br. 2); <u>see also</u> <u>Doe II</u>, 2010 WL 1956585, at *27.  Plaintiffs, however, argue that this distinction "should not deter the Court from applying strict scrutiny" (Pls.' Supp. Post–Trial Br. 2), because <u>Seattle</u> "presents the exact same legal issue as this case," and numerous factual similarities between <u>Seattle</u> and this case remain (Pls.' Post–Trial Br. 2).  The District disagrees, contending that the fact that <u>Seattle</u>, unlike the case at hand, does not involve individualized assignments, indicates that <u>Seattle</u> is "factually inapposite."  (Def's Post–Trial Br. 2-4.)   The District, moreover, avers that because the <u>Seattle</u> majority "did not rule out any and all consideration of race," <u>Seattle</u> neither prohibits the redistricting at issue in this case nor requires that strict scrutiny be applied.  (Def.'s Post–Trial

---

[4] <u>Doe I</u> provided a detailed summary of <u>Seattle</u>.  <u>See</u> <u>Doe I</u>, 689 F. Supp. 2d at 748–50.

Br. 2–4.)

       If the <u>Seattle</u> Court had not emphasized that the student placements at issue in the case used "individual racial classifications," Plaintiffs would have a stronger argument that the lack of individualized student assignments in this case does not preclude application of <u>Seattle</u>'s strict scrutiny standard. Chief Justice Roberts's opinion for the majority of the <u>Seattle</u> Court, however, repeatedly focused upon the school districts' use of individual racial classifications in determining that the student placement plans at issue in <u>Seattle</u> were unconstitutional. Chief Justice Roberts emphasized that both the Seattle and Louisville plans individually assigned students on the basis of race in his initial description of the underlying student placement plans: "In each case, the school district <u>relies upon an individual student's race in assigning that student to a particular school</u>, so that the racial balance at the school falls within a predetermine range based on the racial composition of the school district as a whole." <u>Seattle</u>, 551 U.S. at 710 (emphasis added). Specifically, for the Seattle schools, "the racial composition of the particular school and the race of the individual student" constituted the second in a series of "tiebreakers" that determined who would fill the open slots at an oversubscribed school, while the Louisville schools evaluated whether to place a student at a nonmagnet schools based in part on whether the student's race would violate the school's compliance with the "racial guidelines" requiring such schools to maintain a black student enrollment of between fifteen and fifty percent. <u>Id.</u> at 710, 716.

       In proceeding with its legal analysis, the <u>Seattle</u> majority continued to focus upon the school districts' use of individual racial classifications. Chief Justice Roberts began the constitutional analysis by observing that "[i]t is well established that when the government

distributes burdens or benefits on the basis of <u>individual</u> racial classifications, that action is reviewed under strict scrutiny," and thus, "the school districts must demonstrate that the use of individual racial classifications in the assignment plans . . . is narrowly tailored." <u>Id.</u> at 720 (internal quotation marks omitted) (emphasis added). The <u>Seattle</u> majority then rejected the districts' assertion "that the way in which they have employed <u>individual</u> racial classifications is necessary to achieve their stated ends." <u>Id.</u> at 733 (emphasis added).

Notably, in contrast to the majority's continual focus upon <u>individual</u> racial classifications, the sole section of Chief Justice Roberts's opinion indicating that school districts cannot use race generally in order to obtain a racially diverse proportional student body, Part III.B, represented the views of only four Justices—Chief Justice Roberts, and Justices Scalia, Thomas, and Alito. Justice Kennedy, who joined in Parts I, II, III.A, and III.C of the majority opinion, wrote a separate concurrence emphasizing that he disagreed with Part III.B of Chief Justice Roberts's opinion, because "[d]iversity, depending on its meaning and definition, is a compelling educational goal a school district may pursue." <u>Id.</u> at 783. Nonetheless, Justice Kennedy left no doubt that he agreed with the <u>Seattle</u> majority that the student assignment plans at issue in the case triggered strict scrutiny because they employed "<u>individual</u> racial classifications," which he defined as being "decisions based on an <u>individual</u> student's race." <u>Id.</u> at 784 (emphases added). He explained that in his view, although he believed that pursuing diversity is a compelling educational goal, the Seattle and Kentucky assignment plans were not narrowly tailored to meet that goal, because they used "the crude categories of 'white' and 'non-white' as the basis for its assignment decisions." <u>Id.</u> at 786.

The <u>Seattle</u> majority's consistent focus upon individual racial classifications, coupled

with Justice Kennedy's affirmation of the individual racial classifications standard, and Chief Justice Roberts's inability to command a majority on disapproving of any use of race in assigning students, require this Court to apply strict scrutiny to student assignment plans only if they are based on individual racial classifications.

The extensive testimony and exhibits presented during trial establish that the present case does not involve assigning particular students to attend Harriton High School based on individual racial classifications; rather, the District assigned particular neighborhoods including the Affected Area to attend Harriton High School, and all students in those neighborhoods, both those who were African–American and those who were not, lost their choice of high school. See Doe II, 2010 WL 1956585, at *27. The Court's finding that in Plan 3R, the District Administration recommended to the Board that the Affected Area be redistricted to attend Harriton High School, in part because the Affected Area has one of the highest concentrations of African–American students in the District, see id., falls short of requiring particular students to attend Harriton High School because they are African–American. Thus, the District's adoption of Plan 3R falls outside the facts and holding of Seattle, and is not subject to strict scrutiny in light of Seattle.[5]

### b.    Additional Supreme Court Cases Cited by Plaintiffs

In addition to Seattle, Plaintiffs contend that the following Supreme Court cases indicate that strict scrutiny governs this case:  (1) Grutter, 539 U.S. at 306, and Gratz v. Bollinger, 539

---

[5]Throughout this case, Plaintiffs' counsel ably advocated that the facts underlying the District's adoption of Plan 3R "fit" within the Seattle holding.  However, like the women in the Cinderella fairy tale, who unsuccessfully endeavored to squeeze their feet into Cinderella's tiny glass slipper, counsel simply cannot succeed.

U.S. 244 (2003) (University of Michigan's race–based admissions programs); (2) Adarand
Constructors v. Pena, 515 U.S. 200 (1995) and City of Richmond v. J.A. Croson Co., 488 U.S.
469 (1988) ("Croson") (affirmative action programs concerning government contracts); and (3)
Johnson v. California, 543 U.S. 499 (2005) (prison policy of double–celling inmates by race).
Strict scrutiny, however, is not necessarily required by these cases, because each, like Seattle,
involves a policy that expressly employs individual racial classifications.

The first two cases addressed the constitutionality of the University of Michigan's
admissions policies:  Gratz struck down the undergraduate program's use of a mechanical,
predetermined formula that automatically awarded racial minority applicants extra points towards
admission, and Grutter upheld the law school's consideration of race as one of many factors in
admission, because such consideration was narrowly tailored to the compelling educational
interest of cultivating broad student diversity.  The admissions policies at issue in Gratz and
Grutter, similar to the student placement policy in Seattle, rewarded or burdened prospective
applicants based on individual racial classifications, and thus, were subject to strict scrutiny.

Although the Gratz Court criticized the University of Michigan undergraduate program
for not considering "each particular applicant as an individual, assessing all of the qualities that
individual possesses, and in turn, evaluating that individual's ability to contribute to contribute to
the unique setting of higher education," the Court nonetheless noted that the university's
admissions policy required "a factual review of [each] application to determine whether an
individual is a member of one of these minority groups."  539 U.S. at 271–72.  As a result, rather
than "us[ing] race in a non–individualized manner," as Plaintiffs assert (Pls.' Supp. Br. 4), the
admissions policy struck down in Gratz awarded or declined to award points towards admission

based on individual applicants' racial classifications.

In addition to not individually assigning each student to high school based on his or her membership in particular racial or ethnic group, the District also did not use a "mechanical" process to determine what neighborhoods would be redistricted, such as assigning to Harriton High School students in all neighborhoods with high concentrations of African–American students. Had such a process been employed, North Ardmore, the only other neighborhood with a high concentration of African–American students that had been assigned to attend Lower Merion High School prior to redistricting, would also have been redistricted to attend Harriton, rather than remaining districted to attend Lower Merion High School, as it did under Plan 3R. Thus, contrary to Plaintiffs' assertions, this case does not involve "a factual scenario identical . . . analytically [to] Gratz" (Pls.' Supp. Br. 3).

As for Croson and Adarand, Plaintiffs incorrectly asserted at oral argument that neither case involved "individual selection per se," and instead gave an "edge" to racial minorities. (Docket No. 119.) In Croson, the Supreme Court held that the City of Richmond's policy of requiring prime contractors to award city construction contracts that subcontract at least thirty percent of the contract dollar amount to minority businesses, violated the Equal Protection Clause, because the city failed to "demonstrate a compelling interest in apportioning public contracting opportunities on the basis of race," by identifying the need for remedial action, and to show that non–discriminatory remedies would be insufficient. 488 U.S. at 505. The City of Richmond's policy involved the use of an "unyielding racial quota." Id. at 499.

As for Adarand, a majority of the Supreme Court held that the federal government's practice of giving general contractors on government projects a financial incentive to hire

subcontractors controlled by "socially and economically disadvantaged individuals," and

presuming that racial minorities met this description, should be examined under strict scrutiny.

See 515 U.S. at 204–05, 227. Accordingly, the Adarand Court remanded the case for a

determination of whether the government practice could withstand such scrutiny. See id. at 235.

In so ruling, Adarand broadly stated that "all racial classifications, imposed by whatever federal,

state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny."

Id. at 227. Adarand, like Croson, also explicitly employed individual racial classifications.

Although the underlying federal statutes and regulations were "race neutral," the parties agreed

that the federal government used "classifications based explicitly on race" to create a "rebuttable

presumption used in some certification determinations." Id. at 213.

　　　In both Croson and Adarand, the challenged government policies presumed that members

of certain racial minority groups were disadvantaged when it came to procuring government

contracts, and expressly benefitted members of such groups in awarding government contracts.

See Croson, 488 U.S. at 499–05; Adarand, 515 U.S. at 207. Both cases also involved individual

racial classifications by setting up procedures in which the government contract decisions were

based on an individual subcontractor's race, similar to the school districts' use of an individual

student's membership in a racial minority group to determine his or her high school placement in

Seattle.

　　　Turning next to the unwritten California prison policy at issue in Johnson v. California,

543 U.S. 499 (2005), which placed new or transferred inmates with cell mates of the same race

during their initial evaluations, and which failed strict scrutiny, it expressly used the racial

classifications of individual prospective inmates to segregate them.

13

In sum, this Court is not convinced that the Supreme Court cases relied upon by Plaintiffs require strict scrutiny to be the operative standard for evaluating the constitutionality of the District's adoption of Plan 3R.  All of the cases involve individual racial classifications, which were not used to assign students in this case.  In addition, aside from <u>Seattle</u>, the remaining Supreme Court cases relied upon by Plaintiffs do not involve high school education.

Each of these cases, moreover, involved a policy that expressly considered racial classifications.  In contrast, this case involved a facially neutral redistricting plan and facially neutral redistricting guidelines, and the issue presented is whether the targeting of a specific residential area for school redistricting based on its racial demographics is unconstitutional.  Thus, unlike this case, the Supreme Court cases discussed above did not involve the "additional difficulties posed by [policies] that, although facially race neutral, [may] result in racially disproportionate impact and [may be] motivated by a racially discriminatory purpose," <u>Adarand</u>, 515 U.S. at 213.  In order to address this "additional difficulty," the Court will now turn to the cases setting forth the standard for evaluating such policies.

    **2.**  **Race–Neutral Policies Motivated by a Racially Discriminatory Purpose**

     **a.**  **<u>Pryor v. National Collegiate Athletic Association</u>, 288 F.3d 548, 562 (3d Cir. 2002)**

Notwithstanding the Supreme Court cases discussed above, in <u>Pryor</u>, the Third Circuit determined that "[o]nce a plaintiff establishes a discriminatory purpose based on race, the decisionmaker must come forward and try to show that the policy or rule at issue survives strict scrutiny."  <u>Pryor</u> further explained that "[r]acial classifications, well intentioned or not, must survive the burdensome strict scrutiny analysis because 'absent searching judicial inquiry . . .

14

there is simply no way of determining what classifications are benign or remedial and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.'" Id. (quoting Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977) (internal quotation marks omitted)).

Pryor, however, focused upon the notice pleading standards for purposeful discrimination. In Pryor, the plaintiffs alleged that the National Collegiate Athletics Association ("NCAA") committed purposeful discrimination under Title VI and 42 U.S.C. § 1981, by "adopting certain educational standards because of their adverse impact on black student athletes seeking athletic scholarships." Id. at 552. In reversing the district court's dismissal pursuant to Federal Rule of Civil Procedure 16(b)(6) of the plaintiffs' Title VI and 42 U.S.C. § 1981 claims, id. at 560–61, the Third Circuit in Pryor held that under the notice pleading standards of Federal Rules of Civil Procedure 8 and 9, the plaintiffs "sufficiently alleged a claim for relief," id., at 552. The Pryor court carefully noted that "one may doubt that the NCAA harbored . . . ill motives," given that "many NCAA schools have long engaged in fierce recruiting contests to obtain the best high school athletes in the country, many of whom are black," and "[n]othing in [the Third Circuit's decision] precludes either summary judgment or trial findings that conclude that NCAA did not intend to discriminate on the basis of race." Id. at 566. Nonetheless, despite Pryor's focus on the sufficiency of the pleadings, its holding that once race has been shown to be a motivating factor in decisionmaking, all racial classifications must survive strict scrutiny remains binding on district judges in this Court.[6]

---

[6]Seattle's focus on applying strict scrutiny to student assignment and placement programs only involving individual racial classifications calls into question whether Pryor's pronouncement on the broad applicability of strict scrutiny to policies motivated in part on race,

## b.     <u>Arlington Heights</u> Inquiry

In reaching its conclusion that strict scrutiny applies when race is found to be a motivating factor in decisionmaking, <u>Pryor</u> relies heavily upon <u>Arlington Heights</u>, in which the Supreme Court clarified that "racial discrimination is not just another competing consideration" that courts should analyze in order to determine the decisionmaker's motivations in adopting a challenged policy.  429 U.S. at 265.  Rather, <u>Arlington Heights</u> states that "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified."  <u>Id.</u> at 265–66.[7]  Under <u>Arlington Heights</u>, in order to determine whether "invidious discriminatory purpose was a motivating factor," a court must "conduct a <u>sensitive inquiry</u> into such circumstantial and direct evidence of intent as may be available."  <u>Id.</u> at 266.  Relevant evidence includes the following:  "the historical background of the decision," "[t]he specific sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural sequence," "[s]ubstantive departures," and "[t]he legislative or administrative history . . . , especially where there are contemporary statements by members of the

_____

applies to student assignment plans that do not involve individual racial classifications.

    [7]<u>Adarand</u>, and <u>Johnson</u> stated that "<u>all</u> racial classifications" trigger strict scrutiny.  <u>See</u> <u>Adarand</u>, 515 U.S. at 227 ("[W]e hold today that all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny."); <u>Johnson</u>, 543 U.S. at 505 ("We have insisted on strict scrutiny in every context, even for so-called "benign" racial classifications . . . .").  Nonetheless, as already discussed, <u>Adarand</u> and <u>Johnson</u> involved individual racial classifications, which differentiate them from the present case.  <u>Adarand</u> also took care to note that it "concerns only <u>classifications based explicitly on race</u>, and presents none of the additional difficulties posed by laws that, although facially race neutral, result in racially disproportionate impact and are motivated by a racially discriminatory purpose."  515 U.S. at 213.  This language indicates that the Supreme Court did not intend for strict scrutiny to be applied to cases such as <u>Arlington Heights</u>, <u>Pryor</u>, or this case, in which the challenged policies do not expressly employ "individual racial classifications."

decisionmaking body, minutes of its meetings, or reports." Id. at 267-68.

Arlington Heights, despite requiring lower courts to carefully examine circumstantial evidence to determine whether discriminatory intent exists, also emphasized that an "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." 429 U.S. at 264–65. Thus, plaintiffs still bear the burden of demonstrating "[p]roof of racially discriminatory intent or purpose." Id. at 265.

In this case, the Court specifically "reject[ed] any allegations of invidious discrimination or hostility towards African–American students by the Administration or the Board." Doe II, 2010 WL 1956585, at *28. Nonetheless, the Administration, which the Board entrusted with the responsibility of coming up with redistricting proposals, presented to the Board four redistricting plans, each of which assigned students in either North Ardmore or the Affected Area, the two neighborhoods with the highest concentrations of African–American students, to Harriton High School, and did not allow such students to elect to attend Lower Merion High School instead. Id., at *11, 27–28. Under each of the proposed redistricting plans, the percentage of students at Harriton High School who are African–American would increase from 5.6 percent prior to redistricting, to between 7.8 to 9.9 percent under the given plan, resulting in "racial parity" between the two high schools. See id. at *28. Numerous emails and conversations discussing the inclusion of these two areas, the rejection of the sole redistricting Scenario that did not include one of these areas, the "candid elimination of at least two Scenarios on the basis of race," and testimony by Dr. Haber, the District's redistricting consultant, that race was considered throughout the redistricting process—in short, the historical background of the District's decisionmaking and contemporaneous statements by District officials and Dr. Haber—indicate

that the Affected Area's high concentration of African–American students factored into the District's adoption of Plan 3R. See id. at *27–28. Although the Board Members did not vote on Plan 3R on the basis of race, racial demographics nonetheless factored into the District's recommendation that the Board adopt the Plan.

Under Arlington Heights, when race is a motivating factor, the burden of proof shifts to the governmental entity to establish

> that the same decision would have resulted even had the impermissible purpose not been considered. If this were established, the complaining party in a case of this kind no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose. In such circumstances, there would be no justification for judicial interference with the challenged decision.

429 U.S. at 271 n. 21. Assuming that the District's consideration of the Affected Area's racial demographics in assigning students from that neighborhood to Harriton is considered evidence that race was a motivating factor during redistricting,[8] the appropriate inquiry for this Court is whether Plan 3R would have been adopted regardless of the racial composition of the Affected Area.

## B. Constitutional Analysis

In light of Pryor's language indicating that strict scrutiny applies to any policy using racial classifications, and Arlington Heights, under which strict scrutiny is appropriate if race was a motivating factor in the decisionmaking in question, the Court will analyze whether the District's adoption of Plan 3R was narrowly tailored to compelling state interests. However, if the

---

[8]Notably, no congressional statute or Supreme Court precedent expressly provides that mere consideration of a neighborhood's racial demographics in assigning students to schools constitutes decisionmaking in which race has been a motivating factor.

redistricting in question survives strict scrutiny, it will also survive less searching scrutiny under intermediate scrutiny or rational basis review.

### 1. Summary of Factual Findings

In addition to the factual determinations respecting the role race played in motivating the District during redistricting, the Court made the following findings after reviewing the extensive trial testimony and voluminous exhibits:

- **Excellent, Equal High Schools:** The District's two high schools are two of the best in the state, if not the nation. Doe II, 2010 WL 1956585, at *4. The two high schools offer the same courses and activities, except that Harriton also offers two magnet programs: the International Baccalaureate ("IB") program, and a program offering college–level classes at Penn State University. See id. at *7–8.

- **Equalized High School Enrollment Goal:** The District had to redistrict after the Board accepted the recommendation of the Community Advisory Committee ("CAC"), which included several residents in the District, to build two schools of equal enrollment capacity, as part of the District's capital improvement program to modernize its schools. See id. at *7. Prior to redistricting, Lower Merion High School always had a substantially higher population than Harriton High School. Id. at *8. The overwhelming majority of the Lower Merion Township population lives much closer to Lower Merion High School than to Harriton. Id. at *27 n. 22.

- **Busing and Historic Walk Zones:** With the exception of areas within a mile of District schools that are designated as walk zones, all areas of the District, including the Affected Area, have always received bus service provided by the District. Id. Even though

portions of the Affected Area are within a mile of Lower Merion High School, no section of the Affected Area falls within the historic Lower Merion High School walk zone. See id. at *22–23. None of the trial witnesses testified about how the boundaries of the historic walk zone were selected. Id. at *22 n. 18.

• **Race–Neutral Non–Negotiables:** In April 2008, in the early stages of redistricting, the Board came up with a list of race–neutral Non–Negotiables, which addressed valid educational goals and constitutes mandates that the District must follow, and which included equalizing the student populations in the two high schools, and not increasing the number of buses used to transport children. See id. at *8–9.

• **Community Values:** The following month, the Board hired outside consultants to solicit values identified by residents in the District—"Community Values"—that would help guide the redistricting process. One of the Community Values was to cultivate broad diversity, including "ethnic" and "racial" diversity. See id. at *9–10.

• **Public Presentation of Proposed Plans:** The Administration presented each of the four proposed redistricting plans to the Board at a public meeting open to the District community. See id. at *16–20. After each presentation, the Board solicited input and feedback on the proposed Plans. See id. The Administration took into account the community's feedback in creating and selecting subsequent proposed Plans. See id.

• **3–1–1 Feeder Pattern:** Following the public presentation of Proposed Plan 2, the Board understood the primary community concern to be educational continuity, the desire to keep students together from elementary through to high school in order to ease middle and high school transitions. See id. at *18. Proposed Plans 3 and 3R largely put in place

20

a 3–1–1 Feeder Pattern in which students districted for one of three elementary schools attended the same middle school and the same high school.  See id. at *22–23.

• **Board[9] Vote on Plan 3R:**  Seven of the nine Board members voted in favor of, or expressed support for, Plan 3R.  David Ebby, who voted against the plan, credibly provided valid, pedagogical reasons for voting against Plan 3R, including his view that educational continuity leads to stagnation.  See id. at *26.  Diane diBonaventuro also voted against the plan and made several race–related statements that indicated that she "agonized over . . . the effects . . . Plan 3R would have on African–American students in the Affected Area," but was unsuccessful in persuading the Board to not adopt the plan.  See id. at *25.

## 2.    Narrow Tailoring to Compelling Educational Interests

At trial, the District presented ample evidence that the January 2009 redistricting aimed at addressing the following goals, each of which the Court has already found to have a valid educational interest:  (a) equalizing the populations at the two high schools, (b) minimizing travel time and transportation costs, (c) fostering educational continuity, and (d) fostering walkability.  As the Court will explain, during the redistricting process, the District consistently aimed to satisfy all four of these compelling educational interests.  Because Plan 3R is the only plan the Court is aware of that simultaneously meets these goals, it is narrowly tailored and therefore survives strict scrutiny.  An opposite conclusion is not warranted by the mere fact that the

---

[9]The District's Board is an elected body and its members serve specific terms.  There is an obvious difference between redistricting decisions that violate the Constitution because public officials considered improper individual classifications, such as race, and redistricting decisions that are merely unpopular.  The former are the province of courts, and the latter of the electorate.

District considered the racial demographic makeup of the Affected Area during redistricting.

### a.    Equally Sized School Populations

First and foremost, the District's "cardinal redistricting principal" was that Harriton High School and Lower Merion High School have equal high school student populations.  Doe II, 2010 WL 1956585, at *13.  In fact, the District only decided to redistrict because it accepted the CAC's proposal to modernize the high schools by creating two equally sized high schools, and prior to redistricting, Lower Merion High School's population exceeded that of Harriton High School by 700 students.  See id. at *7.

The CAC, in determining that two equally sized high schools best met the District's educational and pedagogical goals, rejected an alternative option of keeping the high schools at their student enrollment levels prior to redistricting.  See id.  The CAC explained that having a significant disparity in high school populations led to differences in the high schools' educational offerings, and perpetuated traffic and parking problems at Lower Merion High School, the larger high school.  Id.  In contrast, the CAC concluded that equalizing the enrollment at the District's two high schools allowed students to benefit from the smallest possible schools, which would foster a stronger sense of community, better student–faculty interactions, and better educational outcomes, while maximizing student access to programs and facilities, given that each school would offer the same range of courses and co–curricular activities.  Id.

Consistent with the CAC's recommendation, the first Non–Negotiable adopted by the Board was that "[t]he enrollment of the two high schools and two middle schools will be equalized."  Id. at *9.  As demonstrated by the CAC's detailed findings and examination of relevant research respecting educational outcomes, this goal of equalizing high school

populations is a compelling educational interest, because it furthers the legitimate, pedagogical goal of improving student access to courses, teachers, co–curricular activities, programs, and facilities. In order to increase the Harriton student population, redistricting would have to reassign neighborhoods encompassing several hundred students who would otherwise attend Lower Merion High School, to Harriton.

Throughout the redistricting process, the District consistently aimed to achieve numeric equality between the two high schools, id. at *28, as is evidenced by the various redistricting plans it considered. The first redistricting Scenario considered by the Administration was eliminated in part for violating the Board's mandate of two equally sized high schools by projecting a Lower Merion High School student population that exceeded that high school's enrollment capacity by fifteen students, and had 150 more students than Harriton High School. Id. at *13. Unlike Scenario 1, each of the redistricting plans that the Administration publicly presented to the Board prior to Plan 3R, equalized the populations at the two high schools: Proposed Plan 1 projected a Harriton High School population of 1108 and a Lower Merion High School population of 1137; Proposed Plan 2 projected a Harriton population of 1137 and a Lower Merion High School population of 1135; and Proposed Plan 3 projected a Harriton population of 1089 and a Lower Merion High School population of 1185. Id. at *11.

As for Plan 3R, which the Board ultimately adopted, it projected that the two high schools would have equal populations by the 2013 to 2014 school year, after grandfathering is complete. (Pls.' Trial Ex. 4, at 0194.)[10] For the 2009 to 2010 school year, the first year after

---

[10]In referencing pages of the parties' trial exhibits, the Court will only provide the last four digits of the bates numbers, rather than the lengthier, full bates numbers.

Plan 3R was implemented, Harriton had a student population of 894, and Lower Merion High School had a student population of 1401.  Doe II, 2010 WL 1956585, at *26.  Because Plan 3R projected that Harriton and Lower Merion High Schools would have respective enrollments of 798 and 1470 (Pls.' Trial Ex. 4, at 0194), the actual student enrollment figures for the 2009 to 2010 school year showed more students enrolling in Harriton than expected, putting the District on track to equalize the high school populations by the 2013 to 2014 school year.

### b.  Minimal Travel Time and Costs

Several members of the Administration testified at length about the District's inability to increase its number of buses, due to the limitations on bus storage facilities, and given that increasing the number of buses would heighten fuel, storage, and employee costs.  Doe II, 2010 WL 1956585, at *5.  As a result, the District was legitimately concerned about minimizing travel time and transportation costs.

In accordance with such concerns, the District included in its Non–Negotiables the requirement that "[t]he plan may not increase the number of buses required."  Id. at *9.  The community at large also expressed an interest in minimizing travel time for non–walkers, which the District incorporated into the Community Values that were aimed to guide the redistricting process.  Id. at *9 n. 9.

In considering various redistricting options, the District rejected three proposals—Scenario 1, Proposed Plan 1, and the "Travel Equity Proposal" recommended by parents in the community—for failing to minimize travel times and transportation costs.  See id. at *13, 17, & 19.  In fact, the primary reason that the Board rejected Proposed Plan 1 is because it would result in excessive travel times for students.  Id. at *17.  The District only discovered this

after testing the bus travel times in the fall of 2008 and discovering that the travel times had increased significantly from the summer, when travel times had initially been tested. Id. at *17, 17 n. 14. The District continued to be guided by the aim of minimizing travel times. After the public presentation of Proposed Plan 2, two of the three goals that the Board identified as predominant community concerns were that of distance and access, and walkability. Further evidence that the Board in fact tailored its redistricting decision to the need to minimize travel times comes from Board Member Lisa Pliskin's reference in an email to the "no new buses rule." Id. at 19 n. 17.

Given that the overwhelming majority of the students in the District live closer to Lower Merion High School than to Harriton, redistricting would require significant numbers of students to be bused to Harriton. Id. at *27 n. 22. In order to minimize travel times and transportation costs, the District had to assign students to Harriton from neighborhoods that were closest to the high school. As is clear from the maps that the Court reproduced in its factual findings Memorandum, both North Ardmore and the area assigned to attend Penn Valley Elementary, including the Affected Area, are the two areas closest to Harriton High School that were not already districted to attend Harriton prior to the adoption of Plan 3R. See id. at *21–22. In fact, the thick black line indicating the Harriton attendance boundary on the maps for both Proposed Plan 3 and adopted Plan 3R, cuts relatively straight across the District to redistrict the areas closest to Harriton to that high school. See id. As a result, both North Ardmore and the Affected Area were natural candidates for redistricting, and would have been redistricted regardless of the racial and ethnic demographics of those neighborhoods.

Unsurprisingly, the time that it takes students in the Affected Area to travel on District

buses to Harriton is by no means the longest in the District: Students in the Affected Area have eighteen to nineteen minute bus rides, which cover half the distance and take half the time of the longest bus ride in the District, id. at *21.

Given the geography of the District and the fact that most of the District's student population resides closer to Lower Merion High School, Plan 3R meets the District's dual aims of equalizing the high school populations and minimizing travel times. Notably, there is no evidence that another neighborhood in the District could have been redistricted to attend Harriton High School, while simultaneously meeting both the equalization and minimal transportation goals.

### c.      Educational Continuity

In the public comments period following the presentation of Proposed Plan 2, the primary concern with Plan 2 that the community expressed, was that of educational continuity. Id. at *18. Parents were concerned about separating students from their elementary school peers for middle school or high school, and instead favored keeping students together from kindergarten through to grade twelve. Id.

In response to these concerns, the next redistricting plan that the District prepared and considered, Proposed Plan 3, employed a 3–1–1 Feeder Pattern that assigned students districted for three elementary schools to the same middle school and the same high school. Id. at *21. Administrators and Board Members testified at trial that they believed that such a plan had both pedagogical and psychological benefits. See id. at *21, 27. In particular, they testified that the 3–1–1 Feeder Pattern enhances the quality of students' education by facilitating middle school and high school teachers' ability to determine what their students had learned previously, and to

26

build upon that foundation.  See id. at *21, 27.  Even after deciding to expand the walk zone to

accommodate community concerns about walkability, the District kept in place the 3–1–1 Feeder

Pattern with Proposed Plan 3R, albeit with an expanded walk zone.  In addition to fostering

educational continuity, Plans 3 and 3R also met the District's other redistricting mandates of

equalized high school populations and minimized student travel.  Throughout trial, no other

redistricting options that could meet all three goals of redistricting were discussed, again

establishing that the Affected Area would have been selected for redistricting regardless of its

demographic makeup.

Between the Affected Area and North Ardmore, which were natural candidates for

redistricting, the Affected Area is the more logical option, because redistricting students in that

area to Harriton would foster educational continuity, whereas redistricting students in North

Ardmore would not.  Prior to redistricting, students in North Ardmore were districted to attend

Penn Wynne Elementary School, and students in all neighborhoods districted for Penn Wynne

were also districted for Lower Merion High School.  Consequently, keeping North Ardmore

districted for Lower Merion High School allowed all students who attend Penn Wynne to stay

together for high school.  In contrast, students in the Affected Area were districted to attend Penn

Valley Elementary School, but within the areas districted for Penn Valley, only students in the

Affected Area and Haverford had a choice of high school.  Students in all other neighborhoods

districted for Penn Valley were already districted for Harriton.  Thus, redistricting students in the

Affected Area to attend Harriton enabled those students to attend high school with their peers

from Penn Valley Elementary School and Welsh Valley Middle School (with the exception of

those in the historic Lower Merion High School walk zone who elect to attend that high school),

whereas redistricting North Ardmore to Harriton would result in students from Penn Wynne Elementary School and Bala Cynwyd Middle School being split between the two high schools. The selection of the Affected Area for redistricting to Harriton, therefore, was narrowly tailored to meet simultaneously the District's compelling interests of equally sized high schools, minimal student travel time, and educational continuity.

Moreover, the fact that the District incorporated grandfathering into its plans—permitting students who already attended a particular high school prior to redistricting to remain at the same high school even after redistricting—and made grandfathering one of the Non–Negotiables, see id. at *9, 23, provides further proof that the District in fact placed a high priority on facilitating educational continuity.

### d. Maintaining Historic School Walk Zones

While requiring redistricting to equalize the population of the two high schools, minimize travel times and costs, and foster educational continuity, the District also aimed to address walkability, which was one of the Community Values, see id. at *9 n. 9. In addition, the main concern that the community had with Proposed Plan 3 was that of walkability, given that the Plan only permitted a limited number of students in neighborhoods assigned to Harriton to choose to walk to Lower Merion High School. See id. at *22. Plan 3R therefore expanded Proposed Plan 3's abbreviated walk zone to its historical boundaries, which at times spanned a distance of one mile. Id. At trial, the historic Lower Merion walk zone was only briefly described as having been in place since the 1990's. Id. at 23 n. 21.

Although it is unclear why the Affected Area had not been included in the historic Lower Merion walk zone when that zone was designated, neither was there any evidence indicating that

the Affected Area had been excluded on the basis of race.  In fact, regardless of race, expanding

the historic Lower Merion walk zone to include the Affected Area would jeopardize the

District's primary redistricting aim of equalizing the high school populations, by diminishing the

number of students districted for Harriton.  Moreover, such redistricting would also undermine

educational continuity, by permitting students in the Affected Area to leave their peers from Penn

Valley Elementary School and Welsh Valley Middle School, to attend Lower Merion High

School.  As a result, the Court has concluded that Plan 3R was narrowly tailored to meet the

District's compelling educational interests of equalized high school populations, minimal student

travel, educational continuity, and walkability.

### e.        Consideration of Racial Demographics

In addition to the compelling educational interests that have already been discussed, the

District has also asserted that redistricting only took race into account in order to address the

empirically measured "achievement gap" between African–American students and their peers of

other racial and ethnic backgrounds in the District, and "racial isolation" that African–American

students in the District experience when their classes contain only a few students of their

background.  (Def.'s Post–Trial Br. 15–16.)

As the Supreme Court made clear in Grutter, "[c]ontext matters when reviewing

race-based governmental action under the Equal Protection Clause."  539 U.S. at 327.  The

Supreme Court has never prohibited a school district from taking into account the demographics

of a neighborhood as one of many factors in assigning students to schools.  As already explained,

the Seattle majority opinion, rather than prohibiting the mere use of race in assigning students to

schools, narrowly found impermissible the individual assignment of students to high school on

29

the basis of racial classifications. <u>Seattle</u> failed to clarify whether <u>Grutter</u> applies to high school student assignment plans: Although the <u>Seattle</u> majority determined that <u>Grutter</u> "expressly articulated key limitations on its holding," including "the unique context of higher education," 551 U.S. at 725, Justice Kennedy's separate concurrence strongly embraces <u>Grutter</u>'s holding that cultivating broad diversity by using race as one of many factors is a compelling educational goal even in secondary education, <u>see</u> 551 U.S. at 788, 790, a view that the four dissenting Justices share, <u>see</u> <u>id.</u> at 864–66. In this sense, five justices have expressed support for school districts' consideration of broad diversity in assigning students to high school.

Regardless of whether Justice Kennedy's concurring opinion in <u>Seattle</u> is binding under <u>Marks v. United States</u>, 430 U.S. 188 (1977), <u>Seattle</u> did not prohibit school districts from taking race into account as one of several factors that are considered, as <u>Grutter</u> had already permitted. Similar to the University of Michigan Law School's consideration of a multitude of factors, including individual racial classifications, in determining whether a given applicant should be admitted, which survived constitutional scrutiny in <u>Grutter</u>, the District considered neighborhood demographics alongside numerous other goals that did not implicate race—equalizing high school populations, minimizing student travel, fostering educational continuity, and facilitating walkability. <u>Grutter</u> specifically provided that "narrow tailoring does not require exhaustion of every conceivable race neutral alternative." 539 U.S. at 339. Especially because the Court cannot conceive of an alternative redistricting plan that could also meet all of the District's race–neutral goals, the mere fact that the District considered racial demographics in redistricting students in the Affected Area to attend Harriton does not render the District's adoption of Plan 3R unconstitutional. The District has established that Plan 3R would still have been adopted

even had racial demographics not been considered.  See Arlington Heights, 429 U.S. 271 n. 21.

Accordingly, the District's adoption of Plan 3R survives strict scrutiny and comports with the

Equal Protection Clause.

      **C.**     **Title VI and 42 U.S.C. § 1981 Analysis**

Plaintiffs' remaining claims pursuant to Title VI and 42 U.S.C. § 1981 must also fail,

because those statutes' prohibitions against discrimination are coextensive with the Equal

Protection Clause.  See Grutter, 539 U.S. at 343 (finding that because the Equal Protection

Clause was not violated by the law school admissions' use of race, the petitioner's statutory

claims under Title VI and § 1981 must also fail); cf. Gratz, 539 U.S. at 276 ("[D]iscrimination

that violates the Equal Protection Clause of the Fourteenth Amendment committed by an

institution that accepts federal funds also constitutes a violation of Title VI.").

**III.**   **Conclusion**

For the reasons detailed above, the Court has concluded that Plaintiffs are not entitled to

relief on their claims that the District impermissibly and unconstitutionally discriminated against

them on the basis of race.  An appropriate Order entering judgment in favor of the District

follows.

O:\CIVIL 09-10\09-2095 Doe v. Lower Merion\Doe v. Lower Merion - Legal Findings Memo.wpd